Mary E. DODDS, Plaintiff–Appellant,

v.

**CIGNA SECURITIES, INCORPORATED,**
Cigna Individual Financial Services
Company, Incorporated, Connecticut
General Life Insurance Co., Cigna Cor-
poration; and Martin F. Palumbos, De-
fendants–Appellees.

No. 299, Docket 93–7064.

United States Court of Appeals,
Second Circuit.

Argued Sept. 20, 1993.

Decided Dec. 14, 1993.

Cathy J. Bardenstein, Rochester, NY (Gallo & Iacovangelo, of counsel), for plaintiff-appellant.

Glenn T. Marrow, Rochester, NY (Carolyn G. Nussbaum, Nixon, Hargrave, Devans & Doyle, of counsel), for defendants-appellees.

Before: KEARSE and WINTER, Circuit Judges, and POLLACK, Senior District Judge.*

WINTER, Circuit Judge:

Mary E. Dodds appeals from Judge Larimer's dismissal of her amended complaint, holding as a matter of law that Dodds' federal securities claims were time-barred: *Dodds v. Cigna Securities, Inc.*, 841 F.Supp. 89 (W.D.N.Y.1992). The district court also dismissed Dodds' pendent state law claims. We hold that when an investor is provided prospectuses that disclose that certain investments are risky and illiquid, she is on notice for purposes of triggering the statute of limitations that several such investments might be inappropriate in a conservative portfolio. We therefore affirm.

## BACKGROUND

The amended complaint alleged as follows. On February 20, 1990, Dodds, a forty-five-year-old woman with a tenth-grade education and four school-aged daughters, was widowed. She learned that her husband had left her their home, a few personal assets, and approximately $445,000 in death and retirement benefits from his employer, including the proceeds of a savings and investment plan account, an individual retirement account, a life insurance policy, and checking and savings accounts. Before her husband's death, Dodds had no involvement in the family's financial affairs or investment decisions

* The Honorable Milton Pollack, Senior United States District Judge for the Southern District of New York, sitting by designation.

other than receiving an allowance for maintaining the household.

Dodds first met with defendant-appellee Martin F. Palumbos, an employee and/or agent of the appellee corporations, in March 1990. During March and April of 1990, Palumbos met with Dodds at her home on six occasions. During these meetings Dodds told Palumbos that she was wary of financial risk and sought to pursue a "conservative investment strategy" in order to allow her to support her family and provide her daughters with a college education.

On April 1, 1990, Palumbos left Dodds a large portfolio containing prospectuses, marketing materials, and other information on the securities and insurance products that he recommended. In addition, he left a fifteen-page report entitled "Financial Planning Considerations for Mary Dodds," which broadly outlined Dodds' financial situation and the sort of investment portfolio Palumbos recommended. Included were several limited partnerships that ultimately gave rise to the present action. Palumbos told Dodds that he would return in two weeks to discuss her investments.

On April 18, 1990, Palumbos and Dodds met again. At that meeting, Dodds told Palumbos that she had attempted to but had not read the prospectuses because "they looked like greek" to her and she could not understand them. Dodds also told Palumbos that she had given the materials to her brother-in-law, Daniel LaLonde, but that he had not had time to review them. Palumbos discussed the securities he had recommended and assured her that the investments were suitable. The discussion never touched upon the risks of investing in limited partnerships generally or on the risks associated with investing in the specific limited partnerships Palumbos recommended. At the meeting, Dodds signed over the funds she had received from her husband's savings and investment plan account and his I.R.A. On April 24, 1990, Palumbos returned to Dodds' home. At this meeting, Dodds signed the checks necessary to invest the proceeds of her husband's life insurance policy in the securities and insurance products that Palumbos had recommended.

Paragraph 37 of the amended complaint reads as follows:

37. On both April 18, 1990 and April 24, 1990, defendant Palumbos arrived at the plaintiff's home with a number of documents he wanted the plaintiff to sign, stating that the documents were purchase orders for the various securities being purchased. Plaintiff had never seen these documents prior to signing them. The documents were placed in a stack for the plaintiff to sign, and the defendant Palumbos induced the plaintiff to sign the documents without either reviewing them with her, or giving her an opportunity to read them. Additionally, Palumbos induced plaintiff to sign the disclosure statements and subscription agreements without dating them because of 'timing considerations'. . . .

After Dodds had signed the documents, Palumbos left the yellow duplicate copies of the purchase orders but took the originals of the purchase orders and all the other documents that were signed with him. In June 1990, Palumbos returned, sorted the documentation on Dodds' investments, and disposed of the yellow copies of the purchase orders, saying they were "useless."

Dodds took no further action regarding her finances until February 7, 1991, when she met with an accountant to complete her 1990 tax returns. The accountant told her that the investments in the limited partnerships were unsuitable for her. Soon thereafter, Dodds contacted Palumbos and arranged a meeting with him, another financial planner, and her brother-in-law LaLonde.

Dodds contacted an attorney in April 1991. From April through November, Dodds' attorney sought to help her by corresponding with appellee Connecticut General Life Insurance Company. In November, the firm stopped representing Dodds. Dodds hired her present counsel in December 1991 and the instant suit was filed in the Western District on February 4, 1992. Dodds filed an amended complaint on April 30, 1992.

Dodds' amended complaint sets forth eleven claims. Counts one through four allege violations of Section 12(2) of the Securities

Act of 1933, 15 U.S.C. § 77*l*(2) (1988) (the "'33 Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988) (the "'34 Act"), SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, Section 15 of the '33 Act, 15 U.S.C. § 77o (1988), and Section 20 of the '34 Act, 15 U.S.C. § 78t (1988), by the Cigna Companies and Palumbos. Counts five through eleven of Dodds' amended complaint are pendent state law claims for common law fraud, breach of fiduciary duty, negligent misrepresentation, and violation of Section 349 of the General Business Law of New York.

Dodds' federal claims are based on the sale of interests in five limited partnerships that Dodds purchased at the April 18 and 24 meetings. These investments were as follows: (A) 230 units of Technology Funding Secured Investors III limited partnership for $23,000, (B) 32 units of Berry and Boyle Development Partners III limited partnership for $16,000, (C) 800 units of Krupp Cash Plus V limited partnership for $16,000, (D) 500 units of PLM Equipment Growth Fund V limited partnership for $10,000, and (E) 400 units of Net 2 limited partnership for $40,000. All the investments except the last were to be held in Dodds' I.R.A. Dodds' total investment in these five limited partnerships was $105,000.

The gravamen of Dodds' federal claims is that Palumbos and the Cigna Companies made material false statements and omissions inducing her to invest in securities—the five limited partnerships—that were unsuitable for her because they were too risky and illiquid.

Judge Larimer dismissed Dodds' federal securities claims on the grounds that she had not brought suit within the statute of limitations period. *Dodds v. Cigna Securities, Inc.*, 841 F.Supp. 89, 96 (W.D.N.Y.1992).

The court then dismissed Dodds' state law claims without prejudice.

## DISCUSSION

We begin by defining what is not in dispute. Appellant filed this action more than one year after the date on which she made the investments and suffered the alleged losses. It is also uncontested that she did file her suit within one year of when her accountant told her of the investments' unsuitability. All parties also agree that the applicable statute of limitations for Dodds' federal securities claims is the one-year-after-discovery/no-later-than-three-years scheme established in *Ceres Partners v. GEL Associates,* 918 F.2d 349 (2d Cir. 1990), and *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

Appellant challenges the district court's decision on three grounds. First, she argues that the district court erred in not measuring the timeliness of her federal claims from the date on which her accountant told her of the unsuitability of her investments. Second, she argues that the court erred in ruling that there was no fraudulent concealment that would have tolled the statute of limitations. Third, appellant claims that the Supreme Court's decision in *Lampf,* and the language of Section 9(e) of the '34 Act, 15 U.S.C. § 78i(e) (1988), require that the statute of limitations in Section 10(b) of the '34 Act cases run from the time of actual rather than constructive notice. We address these contentions in turn.

### I. *Triggering the Statutory Period*

 Appellant's claims under Sections 11, 12, and 15 of the '33 Act are governed by the statute of limitations contained in Section 13 of the '33 Act. 15 U.S.C. § 77m (1988).[1] Dodds' claims under Sections 10(b), 9, and 20 of the '34 Act are subject to the statute of

---

1. Section 13 of the '33 Act reads in part:
 No action shall be maintained to enforce any liability created under [Section 11 or Section 12(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence. . . .

15 U.S.C. § 77m (1988). Since Section 15 merely creates a derivative liability for violations of Sections 11 and 12, Section 13 applies to it as well. *Herm v. Stafford,* 663 F.2d 669, 679 (6th Cir.1981).

limitations in Section 9(e) of the '34 Act.[2] Broadly speaking, the statutory periods for claims under either of these provisions begin to run when the claim accrued or upon discovery of the facts constituting the alleged fraud. Discovery, however, includes constructive and inquiry notice as well as actual notice.

■■■ A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud. *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983); *Robertson v. Seidman & Seidman,* 609 F.2d 583, 587 (2d Cir.1979); *Arneil v. Ramsey,* 550 F.2d 774, 780 (2d Cir.1977). As we said in *Armstrong,* "The test as to when fraud should with reasonable diligence have been discovered is an objective one. '[T]he means of knowledge are the same thing in effect as knowledge itself.'" *Armstrong,* 699 F.2d at 88 (citation omitted) (quoting *Wood v. Carpenter,* 101 U.S. 135, 143, 25 L.Ed. 807 (1879)). Moreover, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. *Armstrong,* 699 F.2d at 88. Such circumstances are often analogized to "storm warnings." *See Cook v. Avien, Inc.,* 573 F.2d 685, 697 (1st Cir.1978).

■■ The doctrine of equitable tolling is similarly limited. Equitable tolling will stay the running of the statute of limitations only so long as the plaintiff has "exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Arneil,* 550 F.2d at 781 (quoting *Morgan v. Koch,* 419 F.2d 993, 997 (7th Cir.1969)).

■■ Appellant acknowledges that the standard is an objective one. She argues, however, that whether an investor of ordinary intelligence would be on inquiry notice in the circumstances described in the complaint is for a trier to determine and may not be resolved against her as a matter of law. We disagree.

The gist of appellant's amended complaint is that the appellees, in order to make higher commissions, induced her to invest in limited partnerships that were unsuitable for her because of their risk and illiquidity. However, the commissions, the risk, and the illiquidity of investments in the limited partnerships were clearly disclosed in the prospectuses. For example, the prospectus for the Technology Funding Secured Investors III limited partnership has a clearly marked seven-page section entitled "Risk Factors." Within this section, under the subsection "Lack of Liquidity," the prospectus states, "There is no current public or secondary market for the [limited partnership] Units nor is one likely to develop." The section is strewn with warnings about the risks inherent in the limited partnership's intended business— venture capital. Finally, a separate sub-section labelled "Commissions and Other Payments to Participating Broker–Dealers" clearly explains the commissions the broker-dealer receives upon sales of units in the limited partnership.

The prospectus for the Berry and Boyle Development Partners III limited partnership is equally clear. The prospectus on the first page states in bold, all-capital, oversized letters set off from the rest of the text, **"THE SECURITIES OFFERED HEREBY INVOLVE A HIGH DEGREE OF RISK."** Immediately below this warning appears a table with the selling commissions depicted. The second page, under a description of "Risk Factors," states, "No public market for the [limited partnership] Units exists or is expected to develop. Accordingly, the Units should be purchased only as a long-term investment, since investors may not be able to liquidate their investment in

---

**2.** Section 9(e) of the '34 Act reads in part:
No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.

15 U.S.C. § 78i(e) (1988). Because Section 20 merely creates a derivative liability for violations of other sections of the Act, claims under Section 20 are governed by the limitations periods for those other sections. *Herm,* 663 F.2d at 679.

the event of emergency or for any other reason."

■ These warnings, and similar ones in the other prospectuses, were sufficient to put a reasonable investor of ordinary intelligence on notice of the commissions, the risk, and the illiquidity of these investments. Acknowledging the existence of these warnings, appellant emphasizes the length of the prospectuses. Yet despite their length, most of the prospectuses are indexed, or at least have clear section headings on risk, transferability, and commissions. In any event, a failure to read the prospectuses is not excused because of the documents' length. *See Armstrong*, 699 F.2d at 88 ("the means of knowledge are the same thing in effect as knowledge itself"); *DeBruyne v. Equitable Life Assur. Soc. of the U.S.*, 920 F.2d 457, 466 n. 18 (7th Cir.1990) (plaintiff "cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put [her] on inquiry notice").

Moreover, appellant was on constructive notice of the pertinent matters as a result of the one-page disclosure forms she signed before investing in each of the limited partnerships. These documents explicitly warned of the illiquidity of the investments and the commissions to be received. Most of the forms prominently state near the top: "I fully understand the illiquid nature of an investment in [the limited partnership] and that no secondary market is likely to exist for limited partnership units."

Appellant advances two arguments to avert the conclusion that the prospectuses and disclosure forms constituted constructive notice. First, she distinguishes the present case from a number of decisions in which investors were held to be on constructive notice of fraud after they received numerous account statements and quarterly financial reports that disclosed the adverse information of which they later complained. *DeBruyne; Armstrong; Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340 (8th Cir.1980); *Arneil.* It is correct that the present case differs in this regard, but the difference does not affect the outcome. In this case, the matters of which Dodds complains were clearly disclosed in a manner sufficient to put a reasonable investor on constructive notice that she had not been sold investments of the type she sought. In fact, because the issue is the very suitability of the investments in the limited partnerships, account statements and quarterly financial reports would not have substantially enhanced the relevant information available. The riskiest and most illiquid investment may perform well or may perform poorly. Actual performance will shed little light on its *ex ante* suitability for a given investor.

Second, appellant claims that she was defrauded by being sold a portfolio of securities that, when considered in the aggregate, were unsuitable for her. According to her theory, individual prospectuses do not serve to put an investor on notice of aggregate unsuitability because the challenge is not to the suitability of the individual investments but to the suitability for her portfolio of multiple investments in limited partnerships. Specifically, she maintains that prospectuses are an insufficient warning as to the unsuitability of investing in multiple limited partnerships of the kind in question because an investor like her meets the minimum suitability standards contained in the individual prospectuses. She thus argues that a reasonable investor would not have concluded from the prospectuses that investments in multiple limited partnerships constituted an unsuitable portfolio for an investor in her situation. We disagree.

■ We have recognized unsuitability claims as a distinct subset of Section 10(b) claims. *See Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir.1993). However, a reasonable investor must be deemed to have some understanding of diversification and some independent view as to how much risk she is willing to undertake. Issuers cannot be expected to anticipate in their prospectuses or other offering papers the financial needs of every potential investor, the investment alternatives before each potential investor, and the risk averseness of each potential investor. Nor can a plaintiff rely on misleading oral statements to establish an unsuitability claim when the offering materials contradict the oral assurances. *See id.* Moreover, for statute of limitations

purposes, the issue is not whether appellant was given inadequate information about the advisability of investments in multiple limited partnerships but whether she had constructive notice of facts sufficient to create a duty to inquire further into that matter. An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice. Appellant was constructively aware of the portion of her total portfolio that included investments described as risky and illiquid. That sufficed to raise a duty to inquire into whether they constituted too substantial a portion of her portfolio. Constructive knowledge that roughly a quarter of her assets was being invested in risky, illiquid ventures surely constituted at least a "storm warning[ ]" to a reasonable investor with conservative instincts sufficient to raise a duty to inquire further.

Moreover, the minimum suitability standards contained in the prospectuses were not otherwise misleading. In most of the prospectuses, the suitability standards are preceded by a statement such as the one in the Net 2 limited partnership prospectus: "The purchase of Limited Partnership Interests involves certain risks and, accordingly, is suitable only for persons or entities of adequate means having no need for liquidity in their investment." The suitability standards in no way suggested that the other warnings in the prospectuses of the risk and illiquidity of the investments should be ignored if the standards are met. Given these facts, the qualified minimum suitability standards in the prospectuses would not have beguiled a reasonable investor of ordinary intelligence into believing that investment of roughly a quarter of her assets in risky, illiquid vehicles was consistent with her conservative financial plan.[3] Appellant was thus on inquiry notice when she made the investments in question, and her suit was filed more than one year after her claim accrued.

## II. *Fraudulent Concealment*

 Appellant also claims that the district court erred in ruling that there was no fraudulent concealment tolling the statute of limitations. If the defendants actively prevented Dodds from discovering the basis of her claim, then the statute would be tolled for the period of concealment. Appellant relies in particular on *McCoy v. Goldberg*, 748 F.Supp. 146, 158 (S.D.N.Y.1990), in which the statute of limitations was tolled where an investment advisor "deterred plaintiff from examining the extensive offering documents."

Dodds bases her fraudulent concealment argument on several grounds. First, as noted above, Dodds alleges in her amended complaint that at the April 18 and 24 meetings, "the defendant Palumbos induced the plaintiff to sign the documents without either reviewing them with her, or giving her an opportunity to read them." Dodds also alleges that Palumbos returned to her home in June 1990 and threw away copies of the purchase orders she had signed. Finally, Dodds suggests that the fifteen-page report Palumbos prepared for her deceived her into not reading the prospectuses.

It is unclear whether the reference in paragraph 37 of the amended complaint to "the documents" is meant to include the disclosure forms, subscription agreements, and the purchase orders, or some combination of these three items. However, resolution of this ambiguity is not necessary. There is no allegation that defendants prevented or discouraged Dodds from reviewing the prospectuses that were provided to her several weeks before she invested in the limited partnerships. Because receipt of the prospectuses alone put Dodds on constructive notice of her claims, the allegations in question do not amount to fraudulent concealment. For the same reasons, Palumbos' al-

---

**3.** Finally, appellant's suggestion that the question of constructive notice is an improper subject for resolution as a matter of law is contradicted by a vast number of cases in this circuit resolving these issues at the pleading stage. *See In re Integrated Resources Real Estate Limited Partnerships Sec. Litig.*, 815 F.Supp. 620, 639 n. 7 (S.D.N.Y.1993) (citing cases). Where, as here,

the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate.

leged disposal of the purchase orders does not toll the statute.

Finally, the report does not in any way suggest that it could be a replacement for the prospectuses. In fact, the report does not purport to describe the limited partnership investments in any manner other than to list the investments in the "Growth" portion of a chart depicting Palumbos' suggested portfolio. Nor is there any allegation that Palumbos suggested Dodds read the report in lieu of the prospectuses.

### III. *Lampf and Actual Notice*

■ Finally, Dodds contends that the Supreme Court's decision in *Lampf* requires that the statute of limitations in Section 10(b) cases run from the time of actual rather than constructive notice. Dodds argues that the adoption of Section 9(e) as the governing standard in *Lampf* requires that the statute of limitations in Section 10(b) cases run only from the moment of actual notice.

Dodds acknowledges, however, that our cases have held the one-year statute of limitations announced in *Ceres Partners* to run from the time of inquiry or constructive notice. *See, e.g., Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992); *Henley v. Slone,* 961 F.2d 23, 24 (2d Cir.1992). Dodds also acknowledges that we have held in a decision subsequent to the Supreme Court's decision in *Lampf* that the Section 10(b) statutory periods adopted in *Ceres Partners* and later confirmed in *Lampf* include the concepts of constructive and inquiry notice. *Menowitz v. Brown,* 991 F.2d 36, 41–42 (2d Cir.1993). In *Menowitz,* we specifically rejected the argument that the Supreme Court's decision in *Lampf* requires that we measure Section 10(b) claims from the time of actual notice. *Menowitz,* 991 F.2d at 41–42. Only an *in banc* court or an intervening Supreme Court decision can overrule these decisions. *Kremer v. Chemical Construction Corp.,* 623 F.2d 786, 788 (2d Cir.1980), *aff'd,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

Because we have concluded that the district court correctly dismissed Dodds' federal claims as time-barred, we need not address her request to have her supplemental state law claims reinstated or her request for leave to replead.

Affirmed.