**In re EXECUTIVE TELECARD, LTD. SECURITIES LITIGATION.**

**No. 94 Civ. 7846(CLB).**

United States District Court, S.D. New York.

Jan. 31, 1996.

---

Stuart D. Wechsler, Wechsler Harwood Halebian & Feefer L.L.P., New York City, for Moise Katz and Croyden Associates.

Richard Bemporad, David C. Harrison, Lowey, Dannenberg, Bemporad & Sellinger, P.C., New York City, for Mel Weiner.

A. Arnold Gershon, New York City, for John Griffin.

Robert C. Finkel, Wolf Popper Ross Wolf & Jones, L.L.P., New York City, for Joseph Labarca.

Steven Altman, Ziegler, Ziegler & Altman, New York City, Jonathan D. Bassett, Willkie, Farr & Gallagher, New York City, for Executive Telecard, Ltd.

Leon Friedman, Leon Friedman, New York City, for William V. Moore.

Steven Altman, Ziegler, Ziegler & Altman, New York City, for Robert N. Schuck, Allen Mandel, Carl J. Corcoran and Estate of C.C. Duncan.

Steven Altman, Ziegler, Ziegler & Altman, New York City, Richard D. Emery, New York City, for Edward J. Gerrity, Jr.

Leon Friedman, Leon Friedman, New York City, for Network Data Systems, Ltd.

Richard O. Bertoli, Montgomery, PA, pro se.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

This action under Section 10(b) of the Securities Exchange Act of 1934 arises out of the purchase of the common stock of Executive Telecard, Ltd. ("EXTL") by a putative class of purchasers that bought EXTL at allegedly inflated prices during the period of October 28, 1991, through October 27, 1994. By Notice of Motion dated May 15, 1995, defendant Goldstein, Karlewicz & Goldstein ("GKG") moved for an order pursuant to Rules 9(b) and 12(b)(6) of the F.R.Civ.P. dismissing those aspects of the complaint that are barred by the applicable statute of limitations and that are not pleaded with requisite particularity. Defendant Richard Bertoli, Pro Se, by Notice of Motion dated June 24, 1995, moved for an order dismissing Count's II and III as against him as being time barred and not pleaded with particularity as required by Rule 9(b).

EXTL was formed in 1987 as a wholly-owned subsidiary of a company currently known as Residual Corporation, which until February 1994, was called International 800 Telecom Corporation. Residual was then and now is in the business of providing "800" number telephone service outside the United States, and EXTL was formed to provide a credit card calling service over the network that Residual had established. EXTL became a public company in March 1989 by way of a dividend in kind on Residual's common stock, and is now engaged in providing world-wide telephone calling services within

and between foreign countries and territories. Certain of the Director Defendants of EXTL are also officers and/or directors of Residual.

In January 1989, EXTL and Residual entered into a ten-year agreement ("Management Agreement"), under which Residual was to provide to EXTL all offices, personnel, and other facilities for EXTL's general administrative functions, except legal, accounting, advertising, and stockholder relations. In exchange for these services, EXTL agreed to pay Residual 10% of EXTL's gross revenues from its calling services business.

Plaintiffs allege that in EXTL's audited financial statements for the 1991, 1992, 1993, and 1994 fiscal years defendant GKG falsely presented the Company's financial condition by:

(i) Failing to disclose that EXTL advanced "substantial monies" to Residual so Residual could satisfy its obligations under the Management Agreement.

(ii) Improperly recording the account receivable from Residual as an asset of EXTL although it was uncollectible.

(iii) Failing to disclose that Residual was in poor financial condition and unable to bear the financial burden of rendering the services required of it.

(iv) Failing to establish a loss reserve for the supposedly uncollectible receivable from Residual.

(v) Failing to disclose that EXTL was, paying its own administrative costs in view of Residual's financial inability to do so, and failing to reflect such costs as expenses of EXTL.

GKG's alleged liability is predicated on its publication of unqualified audit opinions, where GKG expressly certified to the investing public that (1) its audits of EXTL's annual financial statements were conducted pursuant to Generally Accepted Auditing Standards ("GAAS"); and (2) such financial statements fairly presented EXTL's financial position in conformity with Generally Accepted Accounting Principles ("GAAP"). Plaintiffs allege that EXTL's financial statements violated GAAP in numerous respects and, as a result, painted a distorted and unjustly positive picture of EXTL's financial condition. In particular, Plaintiffs allege that EXTL's financial statements failed to reflect the fact that EXTL's largest debtor, Residual Corporation, was in dangerously poor financial condition, and therefore the account receivable by EXTL from Residual was not likely to be repaid.

Since the motion is directed essentially to the face of the complaint, the Court must assume that the opinion letter of GKG was knowingly false. However, GKG moves for dismissal based on its claim that the statute of limitations had expired prior to the commencement of this action.

In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court held that the limitations period for civil claims under Section 10(b) of the Securities Exchange Act of 1934 is that found in Section 9(e) of the Exchange Act, 15 U.S.C. § 78(I)(e) which provides:

No action shall be maintained to enforce any liability ... unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.

As such, claims brought under Section 10(b) and Rule 10b–5 are subject to a one year/three year statute of limitations.

Plaintiffs purchased shares of Executive TeleCard common stock between October 28, 1991, through October 28, 1994. A Pre–Trial Order entered in this case provided for the consolidation of four actions that were filed between October 29, 1994, and December 1994. The parties do not dispute that fact that if the three year statute of limitations is held to apply the action would be timely commenced. The issue to be decided then is whether the information available to the plaintiffs prior to October 28, 1993, (one year before commencement of this action) was sufficient to place them on "inquiry notice."

■ "Discovery", as it relates to the one year limitations period, has been defined by our Court of Appeals as including "inquiry notice" as well as actual notice. *Menowitz v. Brown*, 991 F.2d 36 (2nd Cir.1993). Discovery occurs when "the plaintiff obtains actual

knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Menowitz*, at 41–42.

Plaintiff's do not allege, nor does defendant GKG contest, that the plaintiffs did not have actual notice of any fraud in this case. Defendant GKG instead argues that the plaintiffs should have been on notice of the alleged fraud because of the information that was contained in both EXTL's and Residual's SEC Forms 10–K. According to GKG, information relating to the interrelatedness of EXTL and Residual, that Residual was incurring a loss because of the management agreement between the two companies, and that EXTL was advancing money to Residual to finance these losses, was all well documented in the Forms 10–K.

■ To show that plaintiffs were on inquiry notice, the moving defendants must demonstrate that circumstances were such as to suggest to a person of ordinary intelligence the probability that he or she had been defrauded. *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2nd Cir.1983), *Lenz v. Associated Inns and Restaurants*, 833 F.Supp. 362, 371 (S.D.N.Y.1993).

Our Court of Appeals has stated that "[a] plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud. The test as to when fraud should with reasonable diligence have been discovered is an objective one. The means of knowledge are the same thing in effect as knowledge itself. Moreover, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. Such circumstances are often analogized to 'storm warnings'." *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346 (2nd Cir.1993) (citations omitted).

■ Plaintiffs argue that whether plaintiffs were on notice of facts which triggered a duty of inquiry is a question of fact, which cannot be resolved against plaintiffs unless it appears beyond doubt that the plaintiff can prove no set of facts which would adequately explain why plaintiff did not become suspicious. *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 969 (5th Cir. Unit B 1981). The rule as stated by the 5th Circuit has not been adopted in this Circuit. In *Dodds*, our Court of Appeals held that a court can, as a matter of law, determine whether an investor of ordinary intelligence would be on inquiry notice in the circumstances described in the complaint. 12 F.3d at 350. *See also Menowitz v. Brown*, 991 F.2d 36 (2nd. Cir.1993), (where Court of Appeals affirmed District Court's finding that inquiry notice existed.) While these decisions establish, as the defendants assert, that a court can decided as a matter of law whether plaintiffs were on inquiry notice, this Court does not interpret those decisions as requiring such a determination. Instead, this Court interprets those decisions as being cases where no reasonable fact finder analyzing the circumstances as presented, could determine that inquiry notice did not exist.

In *Dodds*, the plaintiff claimed that the defendants, in order to make higher commissions, induced her to invest in limited partnerships that were unsuitable for her because of their risk and illiquidity. The Court of Appeals found that the commissions, the risk, and the illiquidity of investments in the limited partnerships were clearly disclosed in the prospectuses. Specifically, the Court found that the prospectus for the Technology Funding Secured Investors III limited partnership had a clearly marked seven-page section entitled "Risk Factors." Within this section, under the subsection "Lack of Liquidity," the prospectus stated, "There is no current public or secondary market for the [limited partnership] Units nor is one likely to develop." The section was strewn with warnings about the risks inherent in the limited partnership's intended business—venture capital. Finally, a separate sub-section labeled "Commissions and Other Payments to Participating Broker–Dealers" clearly explained the commissions the broker-dealer received upon sales of units in the limited partnership. The prospectus for the

Berry and Boyle Development Partners III limited partnership was equally clear. The prospectus on the first page stated in bold, all-capital, oversized letters set off from the rest of the text, "THE SECURITIES OFFERED HEREBY INVOLVE A HIGH DEGREE OF RISK." Immediately below this warning appeared a table with the selling commissions depicted. The second page, under a description of "Risk Factors," stated, "No public market for the [limited partnership] Units exists or is expected to develop. Accordingly, the Units should be purchased only as a long-term investment, since investors may not be able to liquidate their investment in 351 the event of emergency or for any other reason." *Dodds,* at 350.

The facts were equally clear that the plaintiffs were on inquiry notice in *Menowitz v. Brown,* 991 F.2d 36. In *Menowitz,* documents required by the SEC disclosed numerous lawsuits pending against the subject of the investments and certain of the companies' officers, as well as pending civil and criminal investigations. The lawsuits and investigations, disclosed in the prospectus and other reports, concerned, inter alia, alleged breaches of real property installment sales contracts, alleged improper appraisal practices, alleged improper business and marketing practices, and alleged federal and state securities law violations. The gravity of the allegations was supported by the sheer volume of claims disclosed in the documents. For example, a 1989 10–Q report disclosed the pendency of over 80 lawsuits, with thousands of claimants, concerning allegedly improper and fraudulent sales practices.

█ It is undisputed that the following information was presented in EXTL's own Forms 10–K.

(1) That EXTL was formed in 1987 as a wholly-owned subsidiary of Residual. At the time of formation, EXTL issued 1,000,000 shares of common stock to Residual in consideration for (i) $1,000,000, (ii) Residual's agreement to pay for all of EXTL's development and marketing expenses from EXTL's inception to November 15, 1988, and (iii) Residual's return to EXTL of the common shares of EXTL previously held by Residual.

(2) In October 1988, Residual declared a dividend to its shareholders of most of its holding in EXTL stock on the basis of one share of EXTL stock for every ten shares of Residual stock. The effective date of EXTL's SEC registration pertaining to this transaction was March 17, 1989 and 1,000,000 shares of common stock and 1,00,000 warrants were distributed on April 17, 1989. Following that distribution of EXTL stock, Residual retained approximately 200,000 shares of EXTL, representing approximately 15.3% of the outstanding stock of EXTL.

(3) That EXTL was permitted to use business relationships and agreements between Residual and the Postal, Telegraph and Telephone authorities of various countries, as well as Residual's toll-free telephone lines. Residual charged EXTL for line rental fees and installation costs, and required EXTL to make deposits on lines in use. In its Form 10–K dated March 31, 1991, at p. 7, EXTL stated that "any material adverse consequences suffered by [Residual] will have at least the same negative impact upon [EXTL]."

(4) That a significant overlap existed between the officers and directors of EXTL and Residual.

(5) That in January, 1989, EXTL entered into a ten-year Management Agreement with Residual pursuant to which Residual provided EXTL with all offices, personnel and other facilities for general administrative purposes in exchange for ten percent of EXTL's gross revenues from its calling card business. That the agreement would be beneficial to EXTL in the early years of the contract, but could operate to EXTL's detriment in later years if EXTL's revenues grew significantly.

(6) That Residual owed EXTL $3,158,166 as of March 31, 1991 (up from $585,341 a year earlier), $3,142,997 as of March 31, 1992, and $4,845,376 as of March 31, 1993. That EXTL and Residual

entered into a loan agreement that formalized the advances described above, as well as a security assignment agreement under which Residual granted EXTL a security interest in all assets whether tangible or intangible. EXTL reported that it did not expect these advances to be repaid within the next twelve months.

(7) That in May of 1992, EXTL foreclosed on certain of Residual's assets pursuant to the security and assignment agreement thereby reducing Residual's indebtedness to EXTL by approximately $267,000 and in conjunction with that foreclosure, Residual assumed certain of EXTL's notes payable, further reducing Residual's indebtedness to EXTL by $310,825.

The above enumerated information was compiled from the EXTL's 10–K reports from 1991, 1992, 1993. Unlike the *Dodds* case, the information was not printed in uppercase, bolded typeface. Nor was it referenced numerous times in the reports table of contents. And unlike the situation in *Menowitz,* where the report revealed that over 80 lawsuits were pending, the information contained in EXTL's reports are not of the type which this Court could decide as a matter of law, would alert a reasonable investor of ordinary intelligence of the existence of the fraud, or that the account receivable from Residual was essentially uncollectible.

In arguing that the plaintiffs were on inquiry notice of the alleged fraud, the moving defendants urge this Court to consider the Form 10–K reports which were filed by *Residual* during the 1991–1993 reporting periods. The defendants argue that the information contained in EXTL's 10–K's clearly indicates the close relationship of the company to Residual. Such information, they argue, would lead a reasonable investor to examine the 10–K reports of Residual. An examination of those reports would alert the investors of the distressed financial condition of Residual, and that it was unlikely that the loans made by EXTL would ever be repaid. This Court cannot on the present record conclude as a matter of law that a reasonable investor in EXTL of ordinary

intelligence would go to the length of reading or investigating the financial reports of a 15% shareholder of the company in which he or she had invested simply to see if there was adequate provision in EXTL's financials for possible uncollectibility of a large account receivable due from that shareholder.

The defendants argue that despite the unqualified expert opinion of the defendant GKG, plaintiffs should have realized that EXTL's financial statements were improper on their face and should have conducted their own independent investigation. A trier of fact might so find, however, that investors should be entitled generally to rely on the financial statements of public filings. If there was a duty to investigate the value of EXTL's outstanding loans to Residual it was GKG's responsibility to do so and document such findings in EXTL's financial reports. A reasonable investor may not be required to look behind the report. At least a trial juror may so find. *See Duke v. Touche Ross & Co.,* 765 F.Supp. 69 (S.D.N.Y.1991) (Keenan, J.) ("Touche contends as well that it had no duty to disclose anything material to the plaintiffs because there was no fiduciary relationship nor did defendant possess information not readily available to plaintiffs. The Court interprets this argument to mean that Touche can put its name on a PPM and give a glowing recommendation and positive projections to investors, but that it has no duty to tell the investors anything. Defendant charges plaintiffs with a responsibility to do its own independent investigation into the backgrounds of the promoters in order to confirm Touche's statements. If this were so, it is difficult to understand what purpose the PPMs would serve. The Court rejects defendant's position on this point.")

## CLAIMS AGAINST DEFENDANT BERTOLI

Defendant Richard Bertoli, Pro Se, moves for dismissal of Counts II & III as against him. The theory of Count II is that defendant Bertoli together with others violated Section 20 of the Exchange Act by exercising control over the general operations of the company, and possessed the power to control the specific activities which comprise the primary violation about which plaintiffs

complain—namely, disseminating allegedly false and misleading financial statements which misrepresented the financial condition of the company during the class period, and omitting the fact that defendant Bertoli was rendering advice to the directors and the company.

15 U.S.C. 77o which establishes liability for controlling persons under certain circumstances reads in relevant part as follows:

Liability of controlling persons—Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

This Court concludes that the complaint adequately states a claim for liability under § 77o for controlling person liability. While a jury may well find that Mr. Bertoli did not possess such control over the alleged primary violators, such determination is necessarily fact intensive and cannot be resolved on these motions.

■ Count III as against defendant Bertoli alleges that he, together with other defendants, were privy to confidential, non-public proprietary information concerning the Company's true financial condition and its relationships with affiliated parties, and that such defendants caused the sale of EXTL stock at artificially inflated prices prior to the disclosure of the true state of EXTL's business and operations. Defendant Bertoli argues that he was not a buyer or seller of EXTL securities during the class period and that his relationship with EXTL was fully disclosed by numerous stories in the financial press and was reflected in EXTL's stock price. The Complaint alleges that Mr. Bertoli owned and controlled companies that owned significant amounts of EXTL stock and that he caused the sale of EXTL stock at inflated prices. This claim presents disputed factual issues that cannot be decided within the confines of a motion to dismiss.

Likewise, the issue of whether the market of EXTL adequately reflected Mr. Bertoli's involvement with EXTL is factually intensive and is a matter for trial.

This Court does not find the information in EXTL's Forms 10–K should have put the plaintiffs on notice as a matter of law. Such issues are most appropriately revealed at trial or by motion for summary judgment after discovery is complete.

Accordingly, the pending motions are denied.

The Court will hear the pending motion to certify a class on February 21, 1996 at 4:00 P.M., at which time counsel should advise the Court concerning their trial readiness.

SO ORDERED.