J.B. FUQUA, J. Rex Fuqua, The Fuqua Holdings—I, L.P., The Jennifer Calhoun Fuqua Trust, The Lauren Brooks Fuqua Trust, The J.B. Fuqua Foundation, Inc., Plaintiffs–Appellants,

v.

ERNST & YOUNG LLP, Defendant–Appellee.

Docket No. 01–7974.

United States Court of Appeals, Second Circuit.

April 10, 2002.

Nisbet S. Kendrick, III, Esq., Womble Carlyle Sandridge & Rice, Atlanta, GA, Bennette D. Kramer, Esq., Richard H. Dolan, Esq., Schlam, Stone & Dolan, New York, NY, on the brief, for Plaintiffs–Appellants.

Michele Odorizzi, Esq., Mayer, Brown & Platt, Chicago, IL, Dennis P. Orr, Grant J. Esposito, Mayer, Brown & Platt, New York, NY, Kathryn A. Oberly, Robert G. Cohen, Herbert J. Sue, Ernst & Young LLP, New York, NY, on the brief, for Defendant–Appellee.

Present STRAUB and KATZMANN, Circuit Judges, and WILLIAM K. SESSIONS, III,[1] District Judge.

## SUMMARY ORDER

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court be and it hereby is **AFFIRMED.**

Plaintiffs appeal the District Court's dismissal, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, of their securities fraud claims as time-barred. For the reasons that follow, we affirm the decision of the District Court.

This action arises out of the 1999 bankruptcy of Graham–Field Health Products, Inc. ("GFI"). The plaintiffs, formerly major shareholders of Fuqua Enterprises, Inc. ("Fuqua Enterprises"), acquired significant stakes in GFI pursuant to the 1997 merger of Fuqua Enterprises into a subsidiary of GFI, and on February 10, 2000 filed this action against GFI auditor Ernst & Young ("E & Y" or the "defendant") in connection with losses they suffered from their investment in GFI, alleging (i) common law negligent misrepresentation; (ii) violations of Section 11 ("Section 11") of the Securities Act of 1933, 15 U.S.C. § 77k; (iii) violations of Section 10(b) ("Section 10(b)") of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and of Securities Exchange commission Rule 10b–5, 17 C.F.R. § 240.10b–5; and (iv) common law fraud.

In their complaint, the plaintiffs allege that in agreeing to the merger, they relied heavily both on (i) GFI financial statements that had been audited by, and in many cases blessed by an opinion of, E & Y, and (ii) statements made directly by E & Y to the plaintiffs and Fuqua Enterprises attesting to the accuracy of various GFI financial statements. Ultimately, an independent investigation conducted during early 1999 by a committee led by Rogers & Wells LLP ("Rogers & Wells") and Arthur Andersen LLP ("Arthur Andersen") determined that in fact many of these financial statements "were not prepared in accordance with GAAP, and, instead, were intentionally or recklessly manipulated to induce the [plaintiffs] into supporting and participating in the [merger]." On March 23, 1999, GFI issued a press release announcing that the investigative committee had "discovered accounting irregularities and errors that required a restatement of previously issued financial statements for the years ended December 31, 1996 or [sic] December 31, 1997 and the quarterly financial statements issued by [GFI] during 1997."

On July 9, 2001, the District Court granted the defendant's motion to dismiss the action, holding that the plaintiffs had brought their federal claims more than a year after they should have discovered E & Y's alleged fraud. The District Court

1. The Honorable William K. Sessions, III, of the United States District Court for the District of Vermont, sitting by designation.

dismissed the state-law claims without prejudice to a refiling in state court. The plaintiffs appeal the District Court's dismissal of their claims.

We review the District Court's dismissal of the complaint *de novo. Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir.2000). We "accept[ ] all allegations in the complaint as true and draw[ ] all inferences in favor of the plaintiff." *ICOM Holding, Inc. v. MCI Worldcom, Inc.,* 238 F.3d 219, 221 (2d Cir.2001).

Claims under Section 11 and Section 10(b) must be brought both within three years of the alleged violation and within one year of the discovery of the facts underlying the alleged violation. *See* 15 U.S.C. § 77m; *Lampf, Pleva, Lipkind, Prupis, & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). "Discovery" for purposes of the statute of limitations includes constructive notice: "A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." *Dodds v. CIGNA Securities, Inc.,* 12 F.3d 346, 350 (2d Cir.1993). We have held that "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Id.* The date of "discovery" under this "inquiry notice" standard is not actually the date that the duty of inquiry arises; it is the date that the plaintiff, having been put on inquiry notice, " 'in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud.' " *Rothman,* 220 F.3d at 97 (quoting *Sterlin v. Biomune Systems,* 154 F.3d 1191, 1201 (10th Cir. 1998)).

The plaintiffs argue that they were not on inquiry notice against E & Y prior to the January 1999 disclosure by GFI's new management to the Board of the discovery of accounting irregularities, which disclosure led to the independent investigation that uncovered E & Y's role in the alleged fraud. However, E & Y contends that the plaintiffs were placed on inquiry notice on March 23, 1998, when Graham–Field reported fourth-quarter 1997 and year-end 1997 results that were staggeringly below GFI's historical performance and that were radically at odds with the projections of GFI's then-Chairman and CEO in a January 29, 1998 interview with *Dow Jones Newswire.*

We agree with the defendant. The radical decline in GFI's performance disclosed on March 23, 1998, coming on the heels of rosy predictions, constituted a basis for the plaintiffs to inquire into the accuracy of the older financial statements. In the words of the District Court, the losses were "staggering and follow[ed] on the heels of record profits...." Indeed, the March 23, 1998 announcement led *to* a one-day decline of 59% in the trading value of GFI stock. In view of the discrepancy between the company's performance as reflected in the March 23, 1998 results and the company's previous performance, a reasonable investor would have felt a need at least to inquire into whether the older financial statements had in fact accurately portrayed the company's position. Indeed, upon learning of the disappointing results, plaintiff J.B. Fuqua was quoted in the press as stating that he had been "snookered," and that it was impossible for all of the losses to be attributable to the fourth quarter integration costs. While J.B. Fuqua explicitly said that "[w]e haven't used the word fraud or said we were defrauded," the article also reported that J.B. Fuqua had stated that "who knew what and when they knew it is 'a matter of opinion and perhaps will be later deter-

mined.'" The plaintiffs thus appear to have recognized the results as "storm warnings" and recognized the need for some sort of inquiry.

The poor March 23, 1998 results cast doubt on the accuracy of the previously released financial statements simply because of the staggering decline in GFI's performance. The plaintiffs themselves concede that these results constituted inquiry notice against the company, but argue that the results in no way cast doubt on E & Y's role. However, the fact that E & Y had audited, and had opined as to the accuracy of, the financial statements reporting profits which were now being questioned provides sufficient basis for the District Court's finding that the plaintiffs were on inquiry notice against E & Y upon learning of the results released on March 23, 1998. *See Rothman*, 220 F.3d at 96 (inquiry notice against accountants occurred when plaintiffs began to suspect "accounting improprieties" even thought they had no specific information suggesting fraud by the accountants because the suspicion of accounting improprieties "obliged the [plaintiffs] to inquire into [the accountant's] role in the accounting improprieties that the Appellants began to suspect in December 1997."); *see also Rahr v. Grant Thornton LLP*, 142 F.Supp.2d 793, 798–99 (N.D.Tex.2000) ("A reasonable investor, armed with the knowledge that [a company] had been engaged in fraud and having previously relied on the specific reports and endorsements of the defendants [the accountants] found in the company's public disclosures, would have continued investigating to determine whether the defendants had also participated in [the] fraud .... this knowledge of the possibility of a claim is sufficient to put a plaintiff on inquiry notice and to trigger commencement of the limitations period."); *Klein v. Goetzmann*, 810 F.Supp. 417, 424–28 (N.D.N.Y.1993) (evidence of company's fraudulent financial statements triggered

inquiry notice against accountants who had certified those statements where it appeared clear from allegations against company that a responsible auditor would have realized that data upon which statements were based were suspect). Thus, the plaintiffs were placed on inquiry notice against E & Y on March 23, 1998.

■ The plaintiffs claim, however, that dismissal of their claims is inappropriate even if we find that they were on inquiry notice against E & Y on March 23, 1998, arguing that whether they would have discovered the facts underlying E & Y's alleged fraud by February 10, 1999 is an issue of factual dispute inappropriate for resolution on a motion to dismiss. But a motion to dismiss based on a statute of limitations defense rooted in inquiry notice is evaluated under an objective standard, and where "the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers such as the prospectuses and disclosure forms that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *Dodds*, 12 F.3d at 352 n. 3.

This is such a case. Given the fact that Rogers & Wells and Arthur Andersen were able to uncover the alleged fraud within two months, it is unquestionable that, in the words of the District Court, an inquiry undertaken by the plaintiffs would "not have taken five times longer (i.e., more than ten months from Graham–Fields's March 23, 1998 announcement to February 10, 1999, one year before Plaintiffs' filing of the Complaint), particularly since one of the Plaintiffs, J. Rex Fuqua, was a member of the Board of Directors at the time of the March 23, 1998 announcement." Admittedly, Rogers & Wells and Arthur Andersen utilized teams of highly trained professionals, began their investi-

gation only after GFI's new president had directed them to certain accounting problems that he had already uncovered, and conducted their investigation with the full cooperation of the company and its officers. However, as the District Court noted, J. Rex Fuqua had the right as a director to inspect GFI's books and records, Del.Code Ann. Tit. 8, § 220(d), and would have had the power to engage professionals to assist him in inspecting the corporate books. *See Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 130 (Del.Ch.1969). Under these circumstances, the plaintiffs would have uncovered the alleged fraud within 10½ months of undertaking a diligent inquiry. Thus, the District Court correctly concluded as a matter of law that the plaintiffs would have uncovered the alleged fraud by February 10, 1999 had they undertaken a proper inquiry immediately following the March 23, 1998 disclosures.

The judgment of the district court is **AFFIRMED.**