Jerome ENNIS, Fay Ennis, as Trustees of Jerom Ennis, M.D., P.C., Employee Pension Plan, Plaintiffs,

v.

Cesar MONTEMAYOR, and Ferrill D. Roll, Defendants.

No. 97 Civ. 7594(LBS).

United States District Court, S.D. New York.

July 22, 1998.

Charles L. Mandelstam, J. Cody Fitzsimmons, Dornbush Mensch Mandelstam & Schaeffer, LLP, New York, NY, for Plaintiffs.

M. William Munno, Jacqueline Bryks, Seward & Kissel, New York, NY, for Defendants.

## OPINION

SAND, District Judge.

The Plaintiffs, Dr. Jerome Ennis and Fay Ennis, as Trustees of the Jerome Ennis, M.D., P.C., Pension Plan ("Ennis Plan"), brought suit against the Defendants, Cesar Montemayor and Ferrill D. Roll, alleging violations of ERISA and federal securities law, and asserting numerous claims under New York law. Presently before the Court is the Defendants' Motion to Dismiss the Complaint ("Motion") pursuant to Fed. R.Civ.P. 12(b)(6) and 56. For the reasons set forth below, the Defendants' Motion is granted in part and denied in part.

## I. BACKGROUND

### A. *History*

This suit arises from the rapid, near-total loss of a $250,000 investment made by an employee pension plan in a hedge fund. The core question is whether this loss was the product of actionable fraud, or simply the result of an unwise but perfectly legal investment strategy. The pertinent events are described below.

### 1. *The Partnership*

In May 1990, Cesar Montemayor Capital, L.P. ("Partnership"), a Delaware limited partnership, was established. (Def.'s R. 56.1 Statement ¶ 1.) The Partnership was a "global hedge fund" established for the purpose of investing and trading in "securities, commodities, commodity future contracts, financial future contracts, other financial instruments, currencies and rights and options relating to the foregoing." (*Id.* ¶ 4.) Interests in the Partnership were sold pursuant to Confidential Private Offering Memoranda ("OM"), which were updated periodically. (*Id.* ¶ 5.)

### 2. *The Defendants*

Montemayor was the general partner of the Partnership from its inception through July 1992. At that point, Montemayor Asset Management ("MAM"), a New York limited partnership, replaced Montemayor as the general partner of the Partnership. Montemayor and Roll then assumed roles as gener-

al partners of MAM. Roll served in that capacity until June 1995. Montemayor's tenure, however, was shorter. Specifically, Montemayor retired as a general partner of MAM on December 31, 1993, at which point he was replaced by Montemayor Management, Inc. ("MMI"), a Delaware S-Corporation. Montemayor, who is a citizen of Mexico, moved from New York to Mexico around the time he retired as a general partner of MAM. (Montemayor Aff. ¶¶ 2, 10.)

According to Montemayor, he was responsible for the Partnership's investment decisions and risk management while he served as a general partner of MAM, i.e., until December 31, 1993. After that, however, Montemayor acknowledges merely that he "continued to provide investment advice to MAM." (Id. ¶¶ 8–11.)

The relationship between Montemayor, the Partnership and Montemayor Capital Investment, Inc., an offshore fund ("Offshore Fund") for foreign investors, is an issue of dispute in this litigation. According to the Defendants, the Offshore Fund, which was managed by an affiliate of MAM, traded in tandem with the Partnership, thus rendering irrelevant the question of whether Partnership funds that were transferred to the Offshore Fund received the same treatment as funds kept in the Partnership account. (Id. ¶ 14.) As discussed below, the Plaintiffs question this assertion.

### 3. The Plaintiffs

In late 1993, Dr. Ennis contacted the Partnership about an investment. Apparently, Dr. Ennis learned about the Partnership from his daughter, who had shared a house on Long Island with Montemayor and others during the previous summer. (Ennis Aff. ¶¶ 3–4.) In November 1993, Dr. Ennis met with Roll to discuss his proposed investment. At their initial meeting, Roll provided Dr. Ennis with copies of the October 1992 Offering Memorandum ("OM"), the Partnership Agreement, the Subscription Agreement, the 1992 Financial Statement and the Partnership's performance track record. (Id. ¶ 6; Montemayor Aff. ¶ 15.) According to Dr. Ennis, Roll also assured him repeatedly that the Partnership "made the kind of invest-

ments that were appropriate for a Pension Plan." (Ennis Aff. ¶ 9.)

On December 27, 1993, Dr. Ennis, as Trustee of the Ennis Plan, signed a Subscription Agreement to purchase a $250,000 limited partnership in the Partnership. (Def.'s R. 56.1 Statement ¶ 11.) The parties dispute, however, the precise date upon which the Ennis Pension Plan became a limited partner. According to the Plaintiffs, the Ennis Plan became a limited partner as of January 1, 1994, (see Pl.'s Mem. at 16 (citing supporting exhibits)), whereas the Defendants claim that under the Subscription Agreement, the Ennis Pension Plan became a limited partner on January 3, 1994, since that was the first day of business in January 1994. (Montemayor Aff. ¶ 16.) The potential significance of this disagreement is considered below.

### 4. The Partnership's Performance

It is undisputed that Roll, on behalf of MAM, sent monthly letters to the limited partners disclosing financial information. These letters contained information about, among other things: (1) the Partnership's net performance, expressed in terms of percentage change; (2) the investments entered into during the preceding month, including the reasons behind those transactions; and (3) MAM's market projections going forward. (Def.'s R. 56.1 Statement ¶ 21.) Roll's monthly letters also identified the capital balance of the specific limited partner's interest in the Partnership. (Id. ¶ 22.)

With regard to the Plaintiffs, the monthly letters showed the following changes in the value of the Ennis Plan's original investment of $250,000.

| Period Ending | Net Performance(%) | Ennis Account($) | Cumulative Loss($) |
|---|---|---|---|
| 1/31/94 | −6.1 | 234,686 | −15,314 |
| 2/28/94 | −14.9 | 212,693 | −37,307 |
| 3/31/94 | −8.8 | 227,940 | −22,060 |
| 4/29/94 | −16.3 | 209,168 | −40,832 |
| 5/31/94 | −19.8 | | |
| 6/30/94 | −41.9 | 145,382 | −104,618 |
| 7/29/94 | −41.4 | 146,543 | −103,457 |
| 8/12/94 | −70.3 | | |
| 8/31/94 | −68.3 | 79,237 | −170,763 |
| 9/30/94 | −70.6 | 73,489 | −176,511 |
| 10/31/94 | −70.5 | 73,684 | −176,316 |
| 11/30/94 | −74.1 | 64,642 | −185,358 |
| 12/31/94 | −77.1 | 57,331 | −192,669 |
| 1/31/95 | −75.9 | 60,232 | −189,768 |
| 2/28/95 | −81.3 | 45,113 | −204,887 |
| 3/31/95 | −82.1 | 44,743 | −205,257 |

| | | | |
|---|---|---|---|
| 4/28/95 | –84.8 | 37,995 | –212,005 |
| 5/31/95 | –89.7 | 25,735 | –224,265 |
| 6/30/95 | –90.7 | 23,067 | –226,933 |

According to the Defendants, one of the Partnership's key miscalculations concerned the fluctuation of Italian interest rates during 1994–95. (*See* Montemayor Aff. ¶¶ 32–40.) For instance, on or about August 12, 1994, short-term Italian interest rates increased sharply and the Partnership lost almost 30% of its total value ("August Disaster"), bringing its year-to-date losses to approximately 70%. (Roll Aff. ¶ 38.)

After continuing to suffer consistent losses for the next 10 months, the Partnership was dissolved. To wit, on June 21, 1995, Roll notified the limited partners that: (1) Montemayor and he saw "no way" to continue to invest for the Partnership; (2) the Partnership assets had dropped to below $1 million, which foreclosed investing in certain previously accessible markets; (3) the limited partners were invited to withdraw their remaining capital from the Partnership and that the Partnership would waive the 30–day notice requirement for such withdrawals; (4) MAM would withdraw its remaining capital from the Partnership as of August 30, 1995; and (5) any limited partner who had not withdrawn their capital by June 30, 1995, would have their remaining capital returned on August 30, 1995. (Def.'s R. 56.1 Statement ¶ 24.) Moreover, by letter dated July 6, 1995, Roll reported that all of the limited partners had withdrawn their remaining capital from the Partnership and that, as a result, the Partnership had ceased trading as of June 30, 1995. The Ennis Pension Plan received its remaining capital of $23,067 from the Partnership on or about August 15, 1995. (*Id.* ¶¶ 25–26.)

### 5. *Alleged Fraud*

The Plaintiffs claim that the Defendants engaged in a wide array of fraudulent behavior. In principal, however, the Plaintiffs allege that: (1) the Ennis Plan invested in the Partnership on the basis of express representations made in the October 1992 OM that investments by the Partnership would be made in accordance with a method of operation that the 1992 OM stated would be "risk-reduced" and "risk-adjusted"; (2) Dr. Ennis also made his decision to invest in the Partnership based on his confidence in Montemayor as a general partner of the Partnership, as well as the fact that Montemayor and Roll had themselves invested at least $1.8 million in the Partnership. (*See* Pl.'s Mem. at 2.) Contrary to these expectations, however, the Plaintiffs claim that:

Within days after Ennis signed the Subscription Agreement pursuant to which the Ennis Plan became a limited partner of the Partnership, Montemayor and Roll–without providing notice to the Ennis Plan, as required by the Partnership Agreement and by federal and New York law–withdrew virtually all of their personal funds from the Partnership, and Montemayor himself withdrew as General Partner of the Partnership and moved to Mexico. Thereafter, as a direct result of Defendants' intentional failure to follow their own risk-reduced or risk-adjusted investment methods represented in the 1992 OM, the value of the Ennis Plan's investment in the Partnership plummeted from $250,000 to approximately $23,000 (a 91% loss) in less than 18 months and in an investment climate that was highly positive and characterized by substantial appreciation in the value of virtually all investment vehicles. When interest is added, Plaintiffs' loss now exceeds $306,000.

Plaintiffs knew that, as with virtually any investment, there would be some reasonable degree of risk involved in investing in the Partnership. However, at no time did Defendants inform Plaintiffs that they would or had abandoned their risk-reduced and risk-adjusted investment strategy. To the contrary, in the face of the great losses suffered by Plaintiffs, Defendants in monthly letters repeatedly made rosy or upbeat predictions of future earnings and reassured Plaintiffs that they were reviewing their risk-management procedures and controls, which, unbeknownst to Plaintiffs and despite Defendants' previous repeated, express representations, appear not to have been followed or implemented.

(*Id.* at 2–4.)

According to the Defendants, however, the OM contained various risk disclosures relat-

ing to, *inter alia*, illiquidity, leverage, diversification, options, future contracts, allocations and subscription agreements. (Def.'s R. 56.1 Statement ¶ 6.) For instance, several of the OM stated that "[p]urchase of a limited partnership interest in the Partnership may be deemed to be a speculative investment" and that such investment "is designed only for sophisticated persons who are able to bear a substantial loss of their capital contributions in the Partnership." (*Id.*) The Defendants also disclosed that "an investment in the Partnership is a relatively illiquid investment and involves a high degree of risk." (*Id.*) Moreover, the OM warned that "[s]ince the Partnership's portfolio will not necessarily be widely diversified, the investment portfolio of the Partnership may be subject to more rapid change in value than would be the case if the Partnership were required to maintain a wide diversification among companies, securities and types of securities." (*Id.*)

### 6. The Capital Withdrawal

As mentioned above, one central dispute involves MAM's withdrawal of $4,124,778 from its capital account with the Partnership ("Capital Withdrawal"). (Def.'s R. 56.1 Statement ¶ 15.) The Defendants claim that this withdrawal occurred on December 31, 1993–prior to the time that the Ennis Plan became a limited partner. The Defendants also allege that, at any rate, the Plaintiffs were informed of the Capital Withdrawal via the April 1, 1994 OM, which purportedly disclosed that MAM and its affiliates had $200,000 invested in the Partnership and $8.5 million invested in the Offshore Fund. (*Id.* ¶ 17.) Also, according to the Defendants, said withdrawal was disclosed in the Financial Statement and Independent Auditors' Report dated July 12, 1995 ("1995 Financial Statement") prepared by Rothstein Kass & Company ("Rothstein Co."), which report was sent to the limited partners, including Dr. Ennis, on or about July 12, 1995. (*Id.* ¶¶ 19–20.)

The Plaintiffs, however, view the Defendants' purported failure to give notice of their withdrawal of personal capital from the Partnership as evidence of fraud. The Plaintiffs claim that, contrary to the Defendants' assertion that said withdrawal occurred on or before December 31, 1993, Montemayor and Roll actually withdrew the money sometime in January 1994. The Plaintiffs argue that their version of events is "confirmed" by, among other things, the Financial Statement covering the one-year period ending on December 31, 1993, which statement indicates a withdrawal of capital from the Partnership in 1993 of $787,768 and contributions that year of $1,128,603. According to the Plaintiffs, "[t]his statement makes no mention of the withdrawal of virtually all of the general partner's capital, and certainly not the $4,124,778 that was withdrawn in 1994." (Pl.'s Mem. at 20 (citations omitted).)

### 7. Benefit Plan Investors

Another issue in the litigation concerns whether or not the Partnership was subject to the strictures of ERISA. According to the Defendants, ERISA is inapplicable because at no time from January 1, 1994 through June 30, 1995–the time frame during which the Ennis Plan was a limited partner–did "Benefit Plan Investors" covered by ERISA own as much as 25% of the equity interest of the Partnership. (*Id.* ¶ 27.) Indeed, the Defendants claim that Benefit Plan Investors never held more than 4.8% of the equity interest in the Partnership during the relevant time period, excluding (1) MAM's or any of its affiliates' equity interest; (2) Roll's equity interest (but including the equity interest Roll's retirement account held); (3) Montemayor's equity interest; and (4) the Etlin interest's equity in the Partnership. (*Id.* ¶ 28.)

### B. Litigation

The Plaintiffs filed suit on October 14, 1997, asserting both federal question and diversity jurisdiction. (Compl. ¶¶ 1–2.) Of the eight Causes of Action enumerated in the Complaint, two arise under federal statutes. Specifically, the First Cause of Action asserts that the Defendants violated the Employee Retirement Income Security Act ("ERISA"),[1] (*id.* ¶¶ 20–29), while the Second Cause of

---

1. *See* 29 U.S.C. §§ 1001 *et seq.*

Action contends that the Defendants violated Section 10(b) of the Securities Act of 1934 ("1934 Act"), as well as Rule 10b–5 promulgated thereunder.[2] (*Id.* ¶¶ 30–36.) The remaining six Causes of Action regard: (1) breach of contract; (2) breach of fiduciary duty; (3) common law fraud; (4) negligent misrepresentation; (5) common law negligence; and (6) a claim for punitive damages. (*Id.* ¶¶ 37–71.)

Prior to any exchange of discovery, the Defendants filed the instant Motion on January 20, 1998. After granting several adjournments, the Court heard extended oral argument on April 16, 1998. (Tr. Oral Arg. of 4/16/98 ("Tr.") at 1–40.) During that proceeding, the Plaintiffs withdrew the Eighth Cause of Action, which purported to state an independent cause of action for punitive damages, immediately after which the Court granted permission for the Plaintiffs to amend the Complaint to include a prayer for punitive damages as part of any surviving cause of action. In all other respects, the Court reserved decision and thus the Motion became fully submitted at the close of argument. (Tr. at 40.)

## II. DISCUSSION

### A. *Legal Standard*

The Defendants move for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) or, alternatively, for summary judgment pursuant to Fed. R.Civ.P. 56. In deciding a motion to dismiss, the court must look to the four corners of the complaint and accept as true the plaintiff's allegations, construing them in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court will not dismiss the complaint, or any part thereof, unless the plaintiff has failed to articulate a set of facts that would entitle him to relief.

Summary judgment is appropriate when, viewing the evidence in a light most favorable to the non-moving party, there is no genuine issue of material fact. *Brown v. City of Oneonta,* 106 F.3d 1125, 1130 (2d Cir.1997). This device is a "drastic procedural weapon because 'its prophylactic function,

when exercised, cuts off a party's right to present his case to the jury," ' and thus the court must apply the aforementioned standard to all evidentiary facts, regardless of whether such facts are ascertained directly or inferentially. *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 26 (2d Cir.1988) (citation omitted).

### B. *Statute of Limitations*

The Defendants argue that the Plaintiff's First Cause of Action, which states a claim for securities fraud pursuant to Section 10(b) and Rule 10b–5, should be dismissed as time barred under the applicable one-year statute of limitations. We agree.

### 1. *The Law*

■ Under Section 10(b) and Rule 10b–5, an implied private right of action for fraud in connection with the purchase or sale of securities must be commenced within one year after "discovery" of the facts constituting the violation and within three years after such violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Discovery, as it relates to the one-year limitations period, has been defined by the Second Circuit to include inquiry notice as well as actual notice. *Dodds v. Cigna Secs., Inc.,* 12 F.3d 346, 350 (2d Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994); *Menowitz v. Brown,* 991 F.2d 36, 41–42 (2d Cir.1993). Thus:

> A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud. The test as to when fraud should with reasonable diligence have been discovered is an objective one. The means of knowledge are the same thing in effect as knowledge itself. Moreover, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge

---

**2.** *See* 15 U.S.C. § 78j(b) (1994); 17 C.F.R. § 240.10b–5 (1995).

will be imputed to the investor who does not make such an inquiry. Such circumstances are often analogized to "storm warnings."

*Dodds*, 12 F.3d at 350 (internal citations and quotations omitted); *see also* Lewis D. Lowenfels & Alan R. Bromberg, *SEC Rule 10b–5 and Its New Statute of Limitations: The Circuits Defy the Supreme Court*, 51 Bus. Law. 309, 319–22 (1996) (reviewing Second Circuit case law).

■■■■ The doctrine of fraudulent concealment, however, can toll the statute of limitations. *Dodds*, 12 F.3d at 352. Indeed, before determining whether a material issue of fact exists regarding the exercise of due diligence by the plaintiff, the court must as a threshold matter address the plaintiff's defense that the statute of limitations should be tolled because the defendants fraudulently concealed information underlying the plaintiff's claim. *Lenz v. Associated Inns and Restaurants Co.*, 833 F.Supp. 362, 372 (S.D.N.Y.1993). This defense "wields special power" where, as here, a fiduciary relationship binds the respective parties. *Id.* In such a relationship, the complaining party can claim the benefit of the fraudulent concealment doctrine even absent an affirmative representation by the party under the fiduciary duty. That is, fraudulent concealment can occur where the defendant fails to meet its obligations to inform the plaintiff of the facts underlying the claim. *Id.* (citations omitted).

### 2. *Application of Law to Facts*

■■ As mentioned above, the Plaintiffs commenced this action on October 14, 1997. The question to resolve, then, is whether any event occurring more than one year prior to that date was sufficiently decisive so as to have placed the Plaintiffs on inquiry notice of the fraud alleged in the Complaint. *See, e.g., Zola v. Gordon*, 685 F.Supp. 354, 365 (S.D.N.Y.1988) (discussing "decisive relevant act" doctrine). The Court concludes that the answer is "yes," and further that the Plaintiffs failed to exercise due diligence in discharging this duty to inquire.

All of the salient facts upon which the Plaintiffs base their Complaint were within the Plaintiffs' grasp well before October 14, 1996. Consider, for instance, three of the principal factual predicates asserted by the Plaintiffs: (1) that the Partnership failed to follow the risk-reduced investment methodology articulated in the OM; (2) that the monthly letters misrepresented that, from September 1994 forward, the Partnership would implement risk-reduction mechanisms where it had previously failed to do so; and (3) that the Defendants failed to inform the Plaintiffs of the Capital Withdrawal.

With regard to the Partnership's initial high-risk investments, the Plaintiffs knew that the Partnership had engaged in such investments by June 1994. The June 30, 1994 letter, for example, disclosed that the Partnership had lost 27.5% of its value in June 1994 alone, which loss came on top of the 14.4% loss that the Partnership had already suffered since January 1994. Indeed, Roll's June 1994 letter stated that "[w]e have been going through a painful assessment of our investment process, but ironically, find that we have nothing to blame but *our failure to adhere to tenets of our basic philosophy.*" (Roll Aff. Ex. 22 (emphasis added).) Moreover, on August 18, 1994, the Defendants sent to Dr. Ennis another letter disclosing that the Partnership had, in just over two weeks, lost almost 30% as a result of miscalculations concerning Italian interest rates. Roll described these losses in detail, acknowledging that the underlying investments were not hedged. Accordingly, any claim based on the Partnership's *initial* failure to follow a conservative investment philosophy accrued long before the commencement of this lawsuit.

The Court acknowledges the Plaintiffs' claim that, subsequent to the "August Disaster," Roll represented that the Partnership would install more exacting risk-management controls. In fact, at one point Roll stated that "[t]he way forward will lie, we believe, in reinforcing our bias towards the risk reduction characteristics of options." (Roll Aff. Ex. 22.) And the Court further acknowledges that such representations, especially in the context of a fiduciary relationship, could have induced a reasonable person to remain invested in hopes of recouping previous loss-

es. The reasonableness of the Plaintiffs' reliance on such representations, however, extends only so far–specifically, to the date of dissolution, at best.

As the above chart indicates, *see supra* Section I.A.4, the Plaintiffs were apprised of the Partnership's continuing losses during the 10 months *after* the "August Disaster," which losses culminated in the dissolution of the Partnership in June 1995. Accordingly, even assuming arguendo that the Plaintiffs were duped into not investigating the alleged fraud during the entire time that the Ennis Plan was a limited partner, the "storm warnings" surely were evident at the time of dissolution. At that point, the Ennis Plan had lost 91% of its value and had no hope for any recovery of its losses. As the Defendants point out, no reasonable investor could have believed that a Partnership that held only "risk-reduced" investments could nevertheless lose 91% in the aforesaid time frame and investment climate. (Def.'s Mem. at 22–23.) Yet, despite this "glaring contradiction," to employ the Defendants' apt characterization, the Plaintiffs failed to investigate their alleged claim until nearly two years after the Partnership dissolved.

We find this delay inexcusable. *See Klein v. Bower*, 421 F.2d 338, 343 (2d Cir.1970) (noting that doctrine of inquiry notice and constructive knowledge evolved precisely to avoid tolling a statute for a plaintiff's "leisurely discovery of the full details of the alleged scheme"). As was recently explained in an analogous context:

> The defense of fraudulent concealment ... does not function as a trump card on issues of due diligence and constructive knowledge, as plaintiff appears to believe. While the doctrine takes into account the information that a plaintiff did not have as a result of defendants' misconduct, a court must still determine whether the information the plaintiff did receive sufficed to trigger a duty to inquire. If plaintiff was indeed alerted as to the probability of fraud, the court must examine plaintiff's response to ascertain whether he or she exercised due diligence in investigating the potential fraud. As stated previously, plaintiff's

penalty for failure to discharge the duty to inquire consists of being charged with constructive knowledge of the fraud, thereby beginning the limitations period.... The plaintiffs, the victims of the defendant's fraud, are entitled to rely on their confidential relationship with [defendant] to toll the statute of limitations "until some event occurs which would normally awaken suspicion in the[m]."

*See Lenz*, 833 F.Supp. at 373 (citation omitted). Accordingly, we join those courts in the Second Circuit that have "charged plaintiffs with constructive knowledge of an alleged fraud scheme despite the presence of plaintiff's fraudulent concealment defense and a fiduciary relationship between plaintiffs and defendants." *Id.* (collecting cases).

We are aware that the question of whether a plaintiff exercised due diligence in discharging a duty to inquire is often a fact-intensive inquiry best left to post-discovery motion practice or trial. In this case, however, the key material facts are essentially undisputed. Although the Plaintiffs claim that the Defendants engaged in both active and passive concealment, none of the alleged acts or omissions occurred after the date of dissolution. Indeed, as the Plaintiffs acknowledge, it was not until Dr. Ennis consulted with counsel in the Spring of 1997, nearly two years after the date of dissolution, that he decided to investigate further and press suit. (Ennis Aff. ¶ 53.) Under such facts, resolution of the statute of limitations claim is appropriate at this juncture. *See In re Executive Telecard, Ltd. Secs. Litig.*, 913 F.Supp. 280, 283 (S.D.N.Y.1996); Roy M. Van Cleave, *The Federal Securities Acts' One–Year Inquiry Notice Statute of Limitations: Are the Scales Tipped Against Fraud Claimants?*, 22 J. Corp. L. 79, 81–82 (1996) (reviewing "harsh" nature of current statute of limitations, yet noting need for control of opportunistic use of securities fraud remedy in an era where "three years is an age in the stock market").

Finally, the facts surrounding the Capital Withdrawal do not alter this Court's conclusion with respect to the statute of limitations. As the Defendants note, even assuming Dr. Ennis had not been notified of

388

such occurrence at the time of the withdrawal, the April 1, 1994 OM disclosed that MAM had only $200,000 invested in the Partnership–as opposed to the $1.8 million reflected in the 1992 OM. In addition, the Partnership's independent auditor's report issued by the Rothstein Co. in July 1995 also disclosed that MAM had withdrawn capital. *See supra* Section I.6.A. Accordingly, the Plaintiffs had to commence any securities fraud claim based on Capital Withdrawal by July 1996, which deadline they obviously did not meet.

In summary, then, the Plaintiffs are charged with having constructive knowledge of the relevant fraud more than one year prior to the commencement of this suit. The central facts were known in mid–1995, and no justifiable reason has been cited for the Plaintiffs' delay in bringing suit. *See Lenz,* 833 F.Supp. at 373. Accordingly, the Plaintiffs' § 10(b) and Rule 10(b)5 claims are time-barred.

### C. *ERISA*

The Plaintiffs' First Cause of Action purports to state a claim under ERISA. (*See* Compl. ¶¶ 20–29.) Specifically, the Plaintiffs allege that the Defendants were ERISA fiduciaries under 29 U.S.C. § 1002(21)(A)(i) and (ii), and thus subject to the "prudent person" standard for making investments. We disagree and accordingly dismiss this portion of the Complaint.

#### 1. *DOL Regulation*

The ERISA statute reads in relevant part:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or

other compensation, direct or indirect, with respect to any monies or other property of such plan, or has the authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

The Defendants offer two primary arguments in support of their contention that, contrary to the Plaintiffs' assertions, ERISA is inapplicable. First, they cite a Department of Labor Regulation, 29 C.F.R. § 2510.3–101 ("DOL Regulation"), which, according to the Defendants, provides that asset managers who would otherwise be fiduciaries under ERISA's statutory definition are not deemed to be such where, as here, less than 25% of the value of the equity interests in the fund that they manage is held by "Benefit Plan Investors." [3] *See supra* Section I.A.7 (noting that percentage of such investors in Partnership never exceeded 4.8% during relevant time period). And second, the Defendants argue that, at any rate, they were not fiduciaries pursuant to 29 U.S.C. § 1002(21)(A)(ii) because they did not render advice for a fee to the Ennis Plan *per se*, but instead only did so with regard to the Partnership. We find these arguments persuasive.

■ With respect to the DOL Regulation, we note at the outset that the Plaintiffs quarrel neither with the Defendants' interpretation of what the Regulation means, nor with the Defendants' calculation of the percentages of equity interests owned by qualified Benefit Plan Investors. Instead, the Plaintiffs argue that the Regulation either is inconsistent with the plain language and underlying purposes of ERISA, or represents an improper exercise of the rulemaking authority delegated to the Secretary of Labor

---

**3.** The specific text of the DOL Regulation reads as follows: "Equity participation in an entity by benefit plan investors is "significant" on any date if, immediately after the most recent acquisition of equity interests in the entity, 25 percent or more of the value of any class of equity interests in the entity is held by benefit plan investors.... For purposes of determinations pursuant to this

paragraph (f), the value of any equity interests held by a person (other than a benefit plan investor) who has discretionary or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded." 29 C.F.R. § 2510.3–101(f)(1).

under ERISA. (*See* Pl.'s Mem. at 22–30.) Both of these contentions are unfounded.

At bottom, the question is whether the DOL has the authority to define the term "plan assets." We find that the DOL indeed has such authority. In 1986, quite significantly, Congress passed legislation authorizing the DOL to promulgate regulations, and directed the Secretary of Labor to "adopt final regulations defining 'plan assets' by December 31, 1986." *See* Single–Employer Pension Plan Amendments Act of 1986, Pub.L. No. 99–272, § 11001 *et seq.* (1986) ("1986 Act"). Moreover, at the time Congress so authorized the Secretary of Labor, proposed regulations already existed defining the term "plan assets." As the Defendants note, the proposed regulations were similar to the final DOL Regulations except that the percentage threshold for "significant" participation was increased from 20% in the proposed regulations to 25% in the final DOL regulations.

In addition, before promulgating the Regulations, the DOL solicited and received more than 700 letters of comments and conducted extensive hearings. The DOL wished to provide guidance since "[t]here ha[d] been considerable uncertainty regarding what constitute 'plan assets' for purposes of ERISA." (Def.'s Reply Mem. at 8–10 (citing Final Regulation Relating to the Definition of Plan Assets, 51 Fed. Reg. 41,262).) Accordingly, with regard to the specific regulation at issue here, the DOL wrote that it was creating an "exclusion" for "entities in which there was no 'significant' plan investment. This exclusion was intended to deal with investments in entities in which there has been no special solicitation of plan investors. Under the proposal, plan investment was significant if ERISA plans and certain other kinds of benefit plans own more than 20 percent of any class of outstanding equity interests in an entity." 51 Fed. Reg. 41,263. As the Defendant observes:

> In explaining the basis for requiring at least 25% of any class of equity interest in any entity before that entity's assets would be deemed to be "plan assets" under ERISA, DOL noted that "where there is substantial plan investment in an invest-

ment fund there is an expectation on the part of the investing plans that the assets of the fund will be managed in furtherance of the objectives of the investing plans and that in such circumstances the manager of the fund is likely to take the objectives of the investing plans into account in making investment decisions for the fund." [51 Fed. Reg. 41, 269.]

In short, DOL recognized that if benefit plan investors hold less than 25% of any class of equity interest in an entity, *"there is no substantial expectation that the assets of the entity will be managed in furtherance of the investment objectives of the plan investors."* Proposed Regulation, 50 Fed. Reg. at 966 (emphasis added).

The DOL Regulations have been in effect for 12 years and have been followed by plan administrators and the investment community since 1986. According to Plaintiffs, DOL's narrowly framed Regulations should be nullified and all managers of pooled investment vehicles that include assets of even a single benefit plan investor, no matter how de minimus, should now be declared ERISA fiduciaries. Such a revolutionary result alone underscores the fallacy of Plaintiff's argument.

(Def.'s Mem. at 10–11.) We agree with these observations, and conclude, moreover, that because there is no material dispute that the only investment advice that the Defendants rendered related to the investment of Partnership assets, the Defendants are not on these facts ERISA fiduciaries under either 29 U.S.C. § 1002(21)(A)(i) or (ii). Accordingly, the First Cause of Action is hereby dismissed.

## 2. *Waiver*

The Plaintiffs urge that, even if the Court declines to invalidate the DOL Regulation, we should nevertheless find the DOL Regulation inapplicable as a result of the Defendants' waiver. (Tr. at 31.) We reject this invitation.

The Plaintiffs maintain that the Defendants waived the protections of the DOL Regulation because they failed to mention the DOL Regulation in any of the operative documents relied upon by the Ennis Plan at

the time the Plan decided to invest in the Partnership. The waiver argument is also based upon the Defendants' alleged failure to apprise the Plaintiffs of the percentage of the Partnership's capital that was comprised of benefit plan funds, which failure purportedly deprived the Plaintiffs of the opportunity to determine whether the Defendants would be deemed ERISA fiduciaries pursuant to the DOL regulation and thus subject to ERISA's prudent person standard when investing the Ennis Plan's funds. These omissions are especially troubling, the Plaintiffs argue, in light of the fact that, unlike the 1992 OM upon which Dr. Ennis relied, the 1994 OM did provide such information to prospective investors. (Pls.' Mem. at 32–34.)

We decline to endorse the concept of waiver on these particular facts. It would be anomalous, we find, to hold that the Defendants' alleged failure to notify the Plaintiffs that they were, in fact, *not* subject to ERISA, somehow triggers ERISA liability. In making this ruling, however, we do not foreclose the possibility that the Plaintiffs may seek recovery via a different cause of action. We express no opinion, for instance, on whether the underlying facts might support an action for fraud under the common law. That is, to the extent that the Plaintiffs argue that they would not have invested in the Partnership–and thus not lost a considerable sum of money–had the Defendants notified them that the Partnership was not subject to the mandates of ERISA, such facts, if proven at trial, might support an action for fraud. *See infra* Section II.D. Thus, although the Court dismisses the Plaintiffs' First Cause of Action, we decline to foreclose, as a matter of law at this stage of the proceedings, the possibility of recovery on the underlying facts of that claim.

### D. *State Law Claims*

 Apart from the ERISA and securities claims, the Plaintiffs have asserted five other Causes of Action under New York law. (*See* Compl. ¶¶ 37–68.) As mentioned above, these claims involve common law fraud, common law breach of fiduciary duty, common law negligent misrepresentation, breach of contract and common law negligence. (*Id.*)

The Defendants press for dismissal of these claims as well, offering various supporting arguments. They contend, for instance, that the Plaintiffs' claims for common law fraud, common law breach of fiduciary duty and common law negligent misrepresentation must be dismissed because, among other things, Montemayor and Roll did not make any material misrepresentations in the OM or monthly letter reports. (*See* Def.'s Mem. at 6, 37–42.) The Defendants also argue that the Plaintiffs' negligence claim must be dismissed because the Partnership Agreement included an enforceable provision limiting liability, (*id.* at 7, 49–50). Roll and Montemayor further contend that the Plaintiffs' breach of contract claim must be dismissed because the Defendants had no *contractual* obligation to inform the Plaintiffs of the Capital Withdrawal and because the OM and monthly letter reports contained no enforceable promises that could give rise to a breach of contract. (*Id.* at 44–47.)

The Defendants seek too much too soon. As the Plaintiffs point out, the Complaint makes specific allegations which, if believed by the ultimate trier of fact, could support each of the Plaintiffs' state law claims. (*See* Pl.'s Mem. at 39–52, 57–67.) For instance, to the extent that the state law claims are predicated upon the Ennis Plan's having become a limited partner on January 1, 1994, as opposed to January 3, 1994–in other words, prior to the alleged date of the Capital Withdrawal–we decline, at least on a motion to dismiss, to rule against the Plaintiff on this point. At this stage of the litigation, prior to the commencement of discovery, nothing more is required of the Plaintiffs. *Cf. In re Executive Telecard,* 913 F.Supp. at 286.

Accordingly, the Court denies the Defendants' Motion with regard to Counts III–VII, and retains jurisdiction pursuant to the Plaintiffs' uncontested allegation of complete diversity. (Compl. ¶ 2.) The parties should thus commence discovery, with the understanding, of course, that dispositive motions may be filed at the close of discovery to the extent that such motions may be appropriate.

### CONCLUSION

For the foregoing reasons, the Defendant's Motion is granted in part and denied in part.

The Court directs the parties to confer and submit a proposed scheduling order by August 17, 1998. This proposed order should include a discovery schedule, a date for submission of the pre-trial order, and a date for a post-discovery conference with the Court. The parties should also indicate the earliest date by which they anticipate that this case will be ready for trial. Upon receipt of such order, the Court will communicate with the parties to establish a trial date.

SO ORDERED.