In re: DAIMLERCHRYSLER AG SECURITIES LITIGATION.

Tracinda Corporation, a Nevada Corporation, Plaintiff,

v.

DaimlerChrysler AG, a Federal Republic of Germany corporation; Daimler–Benz AG, a Federal Republic of Germany corporation; Juergen Schrempp, a citizen of the Federal Republic of Germany; and Manfred Gentz, a citizen of the Federal Republic of Germany, Defendants.

Glickenhaus & Co., et al., Plaintiffs,

v.

DaimlerChrysler AG, et al., Defendants;

Nos. CIV.A.00–993, CIV.A.00–984, CIV.A.01–004 JJF.

United States District Court, D. Delaware.

June 25, 2003.

## MEMORANDUM AND ORDER

FARNAN, District Judge.

Defendants DaimlerChrysler AG, Daimler–Benz AG, Jürgen Schrempp and Manfred Gentz have filed Motions For Summary Judgment (D.I.528, 530, 532) against each of the Plaintiffs in this consolidated action: (1) Tracinda Corporation ("Tracinda") in *Tracinda Corp. v. DaimlerChrysler AG et al.*, Civil Action No. 00–984–JJF; (2) Glickenhaus & Co. and its clients and affiliates ("Glickenhaus") in *Glickenhaus & Co., et al. v. DaimlerChrysler AG, et al.*, Civil Action No. 01–004–JJF; and (3) The Florida State Board of Administration ("FSBA"), the Policemen's Annuity Fund of Chicago ("PABF"), and the Municipal Employees Annuity and Benefit Fund of Chicago ("MEAB") and the Denver Employees Retirement Plan (collectively the "Class Plaintiffs") in *In re DaimlerChrysler Securities Litigation*, Master Docket No. 00–993–JJF. By this Memorandum And Order, I address that portion of the Motions seeking summary judgment on the ground that these actions are barred by the applicable statute of limitations.[1]

## I. The Parties Contentions [2]

By their Motions, Defendants contend that Tracinda, Glickenhaus, and Class Plaintiffs' federal securities laws claims are barred by the one-year statute of limitations set forth in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). In *Lampf*, the United States Supreme Court concluded that claims brought under the securities laws must be commenced within one year of the discovery of the facts constituting the violation. In *Tracinda Corporation v. DaimlerChrysler AG*, 197 F.Supp.2d 42, 56 (D.Del. 2002), I concluded that the inquiry notice standard applies to all of the claims asserted by Plaintiffs, including their claims un-

---

1. Subsequent decisions will be issued with regard to the remaining issues raised by Defendants' Motions.

2. The underlying facts relevant to this action have been discussed fully in previous decisions in this action. *See e.g. Tracinda*, 197 F.Supp.2d at 49–53. Facts relevant to the disposition of the statute of limitations question are discussed, where appropriate, throughout the body of this Memorandum and Order.

der Sections 10 and 14 of the Exchange Act.

Defendants contend that Plaintiffs had inquiry notice of their claims as early as mid-November 1998, and in any event, no later than September 24, 1999. Yet, the earliest action was filed by Tracinda on November 27, 2000, with the Glickenhaus and other putative class plaintiffs filing their respective complaints subsequently. Thus, Defendants maintain that the Plaintiffs claims are barred by the one-year limitations period.

In support of their contention that Plaintiffs had inquiry notice of their claims, Defendants offer three types of storm warnings: (1) newspaper articles and press releases doubting that the merger would be a merger of equals; (2) shareholders' concerns voiced at the Merger vote that Schrempp would be the dominant figure within DaimlerChrysler; and (3) monthly reports from DaimlerChrysler referring to Chrysler as a "division."

Defendants point to approximately 35 newspaper articles and press releases spanning in time from before the merger closed in mid-November 1998 until September 1999, in which analysts and "persons close to the negotiations" questioned whether the merger was really a merger of equals, and reporters commented on certain management structure changes within DaimlerChrysler. For example, before the Merger closed, the New York Times reported that Daimler–Benz was "expected to be the dominant partner in the future" and a source close to the Merger stated that the term "merger of equals" was used to make the transaction "palatable." (D.I. 540, Ex. 32 at T003609–12). Similarly, the *Financial Times* stated that the merger was "effectively a takeover by the Germans, whatever the euphemisms used to describe the proposed deal." (D.I. 540, Ex. 33 at T3576).

Articles of this type continued into January of 1999 with an article in *Fortune* magazine entitled "The Germans Take Charge," which asserted that Chrysler was organized as a subsidiary of Daimler–Benz and that the company was mostly owned and run by former Daimler–Benz shareholders and executives. Ex. 68. Similar articles followed, with both named and unnamed sources suggesting that the merger of equals was a ruse. For example, the *Washington Post* quoted DaimlerChrysler Vice President Bud Liebler as saying:

> We should have never called this a 'merger among equals,' ... It wasn't a 'merger among equals.' It was an acquisition, and by calling it something else, we confused alot of people on both sides of the Atlantic.

The same article quoted an unnamed "American source familiar with the [Merger] negotiations" as saying:

> It was an ego/political thing.... Bob [Eaton] didn't want Chrysler people to think that he was throwing in the towel, and Schrempp didn't want Washington to think that the German were taking over a company saved by American tax dollars.

(D.I.542, Ex. 79).

Press releases were also issued concerning changes in the management structure, which Defendants contend, coupled with the articles questioning the viability of the merger of equals, should have raised suspicions in Plaintiffs sufficient to trigger inquiry notice. For example, On September 24, 1999, DaimlerChrysler issued a press release stating that Chrysler President Thomas Stallkamp was leaving and that DaimlerChrysler's Management Board was "streamlining" with a composition that leaned toward more former Daimler–Benz executives than Chrysler executives. (D.I. 542, Ex. 96 at T9960–68). Articles fol-

lowed suggesting that he management structure changes were the "final blow" to the "merger of equals" and expressing the view that the transaction had been an acquisition. (D.I.542, Exs.94, 95, 101, 102, 107).

In response, Plaintiffs contend that these articles and the changes within the corporate structure of DaimlerChrysler were not sufficient to put them on inquiry notice. Plaintiffs maintain that there was a mix of information in the public domain, which offset the comments in the articles that Defendants raise. Specifically, Plaintiffs contend that the merger of equals was reaffirmed in other articles, as well as by the statements and filings made by DaimlerChrysler and its representatives both publicly and privately. (D.I. 602, Kamps Exs. 26, 27, 43). Plaintiffs further point out that Defendants hired an army of communications experts whose mission it was to spread the "merger of equals" message and emphasize the importance of maintaining the "merger of equals" language. (D.I. 601, Kamps Ex. 1; D.I. 602, Kamps. Exs. 24, 32 at 1, 28, 34; D.I. 603 Kamps Ex. 56 at DCX 52538–52540). That their mission was effective was confirmed by studies indicating that investors, customers and the government believed that the merger was a merger of equals. (D.I. 602, Kamps Exs. 40, 30, 42).

With regard to the changes in the corporate structure, Plaintiffs contend that Defendants couched these changes in terms of legitimate business decisions and engaged in a detailed media strategy to combat suggestions to the contrary. (D.I. 603, Kamps Exs. 93, 76, 82, 90, 69). Because Defendants effectively masked the true nature of these changes as part of the ultimate scheme of Daimler–Benz to acquire Chrysler, Plaintiffs maintain that they could not have known that the changes in the corporation were actually steps toward the implementation of a "de facto takeover" of Chrysler.

In the alternative, Plaintiffs maintain that they engaged in due diligence, but could not have uncovered the basis for their claims, because Defendants concealed their efforts. In response to this assertion, Defendants contend that Plaintiffs did not engage in any due diligence and should be deemed to have had inquiry notice of their claims.

## II. Legal Standards

### A. *Summary Judgment*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:

do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." ... Where the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party, there is "no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. *Inquiry Notice*

 Under the inquiry notice standard, the statute of limitations begins to run "when the plaintiffs 'discovered or in the exercise of reasonable diligence should have discovered the basis for their claim' against the defendant." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 (3d Cir. 2002). The plaintiffs should have known the basis for their claims when, in the exercise of reasonable diligence, they have "sufficient information of possible wrongdoing to place them on 'inquiry notice' or to excite 'storm warnings' of culpable activity." *Id.* Whether storm warnings have been excited is an objective test, "based on whether a 'reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'" *Id.* (citation omitted). As such, the plaintiffs' expertise should not be taken into consideration when determining whether a reasonable investor would have recognized the information as a storm warning. *Nat'l Rural Elec. Coop. Ass'n v. Breen Capital Serv.*, 2001 WL 294086, *4 n. 6 (D.N.J. Mar.28, 2001). Examples of storm warnings include, but are not limited to, "substantial conflicts between the oral representations of brokers and the text of the prospectus, ... the accumulation of information over a period of time that conflicts with representations that were made when the securities were origi-

nally purchased, or any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made." *NAHC*, 306 F.3d at 1325 n. 5 (citations omitted). The defendants bear the initial burden of showing the existence of storm warnings. *Mathews*, 260 F.3d at 252.

 Once the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable diligence, but were unable to discover their injuries. *Id.* If the plaintiffs' duty to exercise due diligence is triggered, the plaintiffs "are held to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period." *NAHC*, 306 F.3d at 1326 (citation omitted). Whether the plaintiffs exercised reasonable diligence is both a subjective and objective inquiry. *Mathews*, 260 F.3d at 252.

## III. DISCUSSION

Based on the applicable legal standards, I must address, as a threshold matter, whether Defendants have established that the information available to Plaintiffs was sufficient to create storm warnings of culpable activity. After reviewing the information cited by Defendants in the light most favorable to Plaintiffs, I conclude that Defendants have not established that the information available to Plaintiffs was sufficient as a matter of law to alert a reasonable investor to the possibility of fraud. Further, I find that material questions of fact exist which preclude me from granting summary judgment in favor of Defendants.

 Media reports and press articles may constitute "storm warnings" sufficient to put Plaintiffs on inquiry notice. Howev-

er, "there must be some reasonable nexus between the allegations made in the article and the nature of the action subsequently brought." *Berry v. Valence*, 175 F.3d 699, 704 (9th Cir.1999). "A press article's general skepticism about a company's future prospects is not sufficient to excite inquiry into the specific possibility of fraud." *Id.* Further, where there is a mix of information available to the plaintiffs such that any negative statements are tempered by positive statements from a company's management and others, courts have been reluctant to find that the plaintiffs had inquiry notice of their claims. *Milman v. Box Hill Sys. Corp.*, 72 F.Supp.2d 220, 229 (S.D.N.Y.1999) (citing *Ames Dep't Stores, Inc. Note Litig.*, 991 F.2d 968 (2d Cir. 1993)); *In re Complete Mgmt. Sec. Litig.*, 153 F.Supp.2d 314, 338 (S.D.N.Y.2001).

■ In this case, the majority of the articles cited by Defendants are articles based on the skepticism of commentators and analysts unrelated to the merger that the transaction between Chrysler and Daimler–Benz would not be an equal merger. But, even if these articles were grounded in more than mere media speculation, they were substantially off-set by other public reports and articles and by Defendants' assurances that, contrary to any news reports, the merger was an equal combination of the two companies. (D.I. 615, Compendium, Tab 106 (DCX 0056328–30)). Defendants repeatedly made both public and private statements touting the merger as a merger of equals and debunking any claims that the transaction was a take-over. When shareholders voiced concerns about potential German dominance in the merger, they were corrected immediately by Mr. Eaton who insisted that the transaction was not a takeover, but a "merger of two equally strong companies." (D.I. 603, Kamps Ex. 48 at DCX 23190, 23204–05). Mr. Eaton's public assurances were

strengthened by his private assurances to Jim Aljian on behalf of Tracinda and Seth and James Glickenhaus on behalf of Glickenhaus. (D.I. 544, Aljian Tr. 354:3–25; 351:2–25).

Mr. Eaton's representations were consistent with the very public representations of Mr. Schrempp, who emphasized to Daimler shareholders that the merger was a merger of equals in which managerial control would be shared by both companies. To this effect, Mr. Schrempp stated that the "Supervisory Board will also reflect the make-up of the new company—two partners with equal weight—and the international expertise of DaimlerChrysler." (D.I. 601, Kamps Ex. 7 at DCX 7504). Mr. Schrempp's public assertions were similarly bolstered by his personal, private assurances to Seth and James Glickenhaus that the merger would be a merger of equals. (D.I. 545, SG Tr. at 53:10–54:21; 58:12–22; JG Tr. at 71:3–15; 46:17–21; 105:8–15). The statements of both Eaton and Schrempp were further bolstered by the official merger statements and documents, all of which described the transaction as a merger of equals.

As for management changes, both Eaton and Schrempp, as well as several news articles and press releases, maintained that these changes were part of the normal course of business and were not evidence of a take-over of Chrysler by Daimler–Benz. Both Schrempp and Eaton refused to characterize the merger as a take-over and both maintained that the merger was a merger of equals. With regard to Stallkamp's departure, DaimlerChrysler went so far as to characterize his departure as a signal that the "merger of equals" was a success. (D.I. 603, Kamps Ex. 49 at DCX 36136, Ex. 71). In this regard, Schrempp testified that Stallkamp's departure and his subsequent replacement with Holden "could not have been a better showing of the fact that it

was a merger of equals, and this occurred at a time when there were still two co-chairman of the member of [sic] the Management Board of Chrysler." (D.I. 546, Schrempp Tr. 362:14–363:11). Yet, the evidence offered by Plaintiffs suggests that Holden's replacement was a further part of Defendants' scheme to take control of Chrysler, because, though publicly hidden, Holden and other Chrysler executives had no real input as to the management of DaimlerChrysler. (D.I. 602, Kamps Ex. 79; D.I. 545, Holden Tr. 217:13–21).

Defendants contend that the mixed messages created by their representations should have heightened Plaintiffs' awareness of the potential fraud. I find Defendants' position untenable. Defendants are basically seeking to punish Plaintiffs for trusting their word, a position which I find to be at odds with their role as corporate insiders. When evaluating the mix of information available to them, Plaintiffs had a right to believe in and trust the position of management who knew the terms of the arrangement intimately, as opposed to the speculation of media analysts and commentators who analyzed it from afar. *See e.g. In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.1989) (recognizing that "[t]he investing public justifiably places heavy reliance on the statements and opinions of corporate insiders").

As the Second Circuit recognized in *LC Capital Partners, LP v. Frontier Insurance Group, Inc.*, 318 F.3d 148, 154 (2d Cir.2003), "[t]here are occasions where, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management." Reassurances can dissipate apparent storm warnings "if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns." *Id.* Among the factors to consider in determin-

ing whether reassuring statements are sufficient to dissipate any storm warnings, is "how substantial are the 'reassuring steps' " of management. *Id.* In my view, one would be hard pressed to find a case where management took more substantial steps to dissipate storm warnings than in this case. Defendants mounted an aggressive, all-out campaign to counter any assertions that the merger was not a merger of equals. Their efforts included hiring experts, engaging in strategy sessions, and using the media and its most visible corporate figures to promote the merger of equals concept and ensure that the message "sunk-in."

Defendants rely on several cases in which newspaper articles were sufficient to create the storm warnings necessary to trigger inquiry notice and the assurances of management were insufficient to negate storm warnings. However, I find these cases to be distinguishable from the circumstances of this case. In those cases cited by Defendants, the newspaper articles referred to lawsuits that had been previously filed, official investigations that were being conducted, or allegations and incontrovertible objective evidence of fraud. *See e.g. Eckstein v. Balcor*, 58 F.3d 1162, 1169 (7th Cir.1995) (finding article that reported a settlement in another lawsuit based on the same allegations to be sufficient to create a storm warning); *In re Ultrafem Inc. Sec. Litig.*, 91 F.Supp.2d 678, 692 (S.D.N.Y.2000) (finding article that reported on SEC "informal inquiry" to be a storm warning); *In re Tyco Int'l, Ltd. Sec. Litig.*, 185 F.Supp.2d 102, 107, 116 (D.N.H.2002) (finding article to be a storm warning where fund manager reported alleged use of improper accounting methods). The bulk of the articles in this case were not so blatant or concrete and generally consisted of rampant speculation.

As for the cases involving the reassurances of management, those cases also in-

cluded more concrete evidence of the alleged fraud. For example, in *Great Rivers Coop. v. Farmland Indus., Inc.*, 120 F.3d 893, 898 (8th Cir.1997), the equity holder had notice that a lawsuit had been filed against the company, and management's reassurances consisted of the self-serving statements that the lawsuit was "ludicrous" and "ridiculous." Similarly, in *In re Merrill Lynch Ltd. P'ships Litig.*, 7 F.Supp.2d 256, 274–275 (S.D.N.Y.1997), the plaintiffs were alerted to the fraud by the prospectus and the annual reports. In light of this hard evidence, the court declined to find that management's general reassurances about the state of the real estate market were sufficient to dissipate the storm warnings and relieve the plaintiffs of their duty to investigate.

Unlike the circumstances in *Great Rivers* and *Merrill Lynch*, Plaintiffs in this case were not confronted with a lawsuit, and the proxy and prospectus actually concealed Defendants' alleged fraud and bolstered their representations that the

merger was a merger of equals. While self-serving assurances from management may be sufficient to raise suspicions in the context of actual allegations of fraud or hard evidence of fraud, I do not find such assurances to be sufficient to raise the suspicions of a reasonable investor in the context of this case, where there were no allegations of fraud, management was primarily rebutting the views of corporate outsiders[3] and management's statements were bolstered by the proxy, prospectus and other hard material related to the transaction.[4]

■ I am also not persuaded by Defendants' contention that Plaintiffs were on inquiry notice of their claims, because the financial and annual reports from Daimler-Chrysler broke down the financial figures between Mercedes and Chrysler, thereby suggesting that Chrysler had been relegated to a division. As Plaintiffs point out, it was not unusual for the company to provide stand-alone results for the different groups within DaimlerChrysler, because

---

**3.** Defendants refer to two articles, one which quoted an unnamed source close to the merger and the other which quoted A.C. Liebler, Senior Vice–President of Global Brand Marketing, which suggested that the merger was not really a merger of equals, but that the term was being used for "psychological reasons" to make the transaction "palatable." However, I am not persuaded that these articles were sufficient to raise storm warnings in the context of this case. Named and highly visible, more senior executives, Eaton and Schrempp, i.e. the virtual voices of Chrysler and Daimler–Benz, continued to publicly deny anything other than that the transaction was a merger of equals. Further, the evidence offered by Plaintiffs suggests that these articles may have been the result of misstatements or inaccurate reporting. Thus, at the very least, I find that a factual question exists as to whether these articles in the overall mix of information would have been sufficient to raise the storm warnings necessary to excite inquiry notice.

**4.** Defendants' representations that the merger was a merger of equal control were also confirmed by their additional submissions to the SEC, the S & P 500 Index Committee and the New York Stock Exchange. The SEC asked Defendants to clarify whether the merger of equals language in the Proxy/Prospectus meant a merger of two companies of equal financial size or a merger in which control would be shared equally. Daimler–Benz's attorney responded by referring the SEC to a letter sent to Chrysler shareholders, which was also included as the introduction to the Proxy/Prospectus that "through the 'merger of equals' transaction, DaimlerChrysler AG will bring together two companies with equal financial strength under the joint leadership of both management groups..." (D.I. 615, Compendium, Tab 96 (DCX 0059481)). Similarly, DaimlerChrysler was represented to the S & P 500 and the NYSE as a "U.S. Company" with "U.S. character" and a dual management split 50/50 between the two companies. (D.I. 615, Compendium, Tab 120 (DCX 0081764–65), Tab 119 (DCX 0011169–72)).

the earnings for these groups were reported in different currencies. Further, Defendants continued to represent that the merger was a merger of equals, thereby enforcing the perception that the break down was for reporting purposes and not the result of a new corporate structure.

Defendants also maintain that Plaintiffs did not need proof of scienter in order to assert their claims under the securities laws. In support of this proposition, Defendants rely on *Theoharous v. Fong,* 256 F.3d 1219 (11th Cir.2001) and *Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687, 695 (10th Cir.1981). Although Defendants correctly characterize the holdings of these cases, I am not persuaded that they are applicable in the circumstances of this case.[5] As I recognized in *Tracinda,* the misstatement that underlies Plaintiffs' claims is Defendants' promise that the transaction would be a merger of equals, coupled with their concealed intent to never fulfill that promise and their later refusal to actually fulfill that promise. *Tracinda,* 197 F.Supp.2d at 60 (discussing *The Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.,* 532 U.S. 588, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001)). Thus, by the very nature of their claims, Plaintiffs could not have been on notice of their claims until they could have discovered Defendants' concealed intent.

Further, I find the cases cited by Defendants to be distinguishable from this case. In *Theoharous,* the plaintiffs contended that the defendants made false and misleading statements concerning the company's financial performance, thereby concealing its poor financial condition until the company filed for bankruptcy. However, the plaintiffs filed suit more than one year after the company filed for bankruptcy. The plaintiffs maintained that their suit was not time-barred, because they could not have known that the defendants acted with the scienter needed to violate Section 10(b). Rejecting the plaintiffs' arguments, the court concluded that the plaintiffs did not have to " 'fully discover the nature and extent of the fraud before [they] were on notice that something may have been amiss. Inquiry notice is triggered by evidence of the *possibility* of fraud, not full exposition of the scam itself.' " 256 F.3d at 1228 (emphasis in original). Similarly, in *Peterson,* the plaintiffs had notice of the actual fraud, but did not file their lawsuit within the limitations period.

Unlike the Plaintiffs in *Theoharous* and *Peterson,* Plaintiffs in this case had no notice that Defendants' merger of equals representations were actually misrepresentations designed to mislead investors into approving a disguised takeover. Indeed, the evidence offered by Plaintiffs suggests that Defendants ensured that Plaintiffs would have no notice of their misrepresentations by mounting an aggressive campaign insisting that the merger was a merger of equals and refuting any claims to the contrary. In these circumstances, I agree with Plaintiffs' assertion that they could not have known that

---

5. Moreover, in light of the stringent pleading requirements under the PSLRA, I am not persuaded that the statute of limitations starts to run before the plaintiffs have notice that the defendants acted with the requisite scienter in making the false misrepresentation in a Rule 10b–5 case. The Third Circuit has not clearly spoken on this issue, and contrary to the holdings in *Theoharous* and *Peterson,* at least one court, has concluded that for purposes of Rule 10b–5, the statute of limitations does not run until the plaintiffs knew or should have known that the defendants "made a representation that was *knowingly* false." *Law v. Medco Research, Inc.,* 113 F.3d 781, 784 (7th Cir.1997) (emphasis in original) (requiring scienter for the statute of limitations to run for fraud claims under Rule 10b–5, but requiring only knowledge that the statement was false for claims under Section 13 of the Securities Act alleging a false registration statement).

the merger of equals representations were false, until Schrempp revealed his true intent in the *Financial Times* article in October of 2000.

Defendants' analogy to meteorology is particularly appropriate. Defendants contend that the storm warnings in this case were Category V, hurricane-type warnings. However, Defendants neglect to point out that they were the weathermen with all the technology and expertise to render the forecast. They assured Plaintiffs and the public that the partly cloudy skies and mild winds were not the precursors of any storm. Rather, the clouds would surely break and the wind would surely die down, giving way to an overall calm and sunny day for DaimlerChrysler. Given this forecast, I cannot fault Plaintiffs for being caught without their umbrellas.

■ In the alternative, and at a minimum, I find that there are genuine issues of material fact about both notice and due diligence, such that summary judgment is inappropriate. On summary judgment, the facts must be viewed in the light most favorable to the nonmovant. Given the mix of information available to the Plaintiffs, including the rebuttals of Daimler-Chrysler executives to any suggestion that the merger was a take-over, questions of fact exist as to what inferences a reasonable shareholder would have drawn from the available evidence. *Gruber v. Price Waterhouse*, 911 F.2d 960, 963 (3d Cir. 1990) (recognizing factual nature of statute of limitations inquiry); *Hill v. Equitable Bank, Nat'l Assn.*, 655 F.Supp. 631, 641 (D.Del.1987), *aff'd*, 851 F.2d 691 (3d Cir. 1988) (denying summary judgment based on the statute of limitations defense where plaintiffs presented reasonable inference that investors would not be on inquiry notice of fraud); *Vogel v. Trahan*, 1980 WL 1378, *7 (E.D.Pa. Jan.11, 1980) ("Issues of notice and due diligence often turn on inferences to be drawn from the underlying ·facts. . . . In such circumstances, genuine issues of material fact remain and the court cannot substitute its judgment for that of the jury."). Further, even if I were to find that Defendants established the existence of storm warnings, I would deny summary judgment on the grounds that there are factual questions regarding the extent and nature of the due diligence conducted by Plaintiffs.

Defendants criticize the *Vogel* and *Gruber* decisions as outdated and point to numerous decisions where the statute of limitations question was resolved in favor of the defendant on a motion to dismiss or a motion for summary judgment. Specifically, Defendants point out that the *Vogel* and *Gruber* decisions pre-date the Third Circuit's decision in *NAHC* which recognized that statute of limitations questions may be resolved on a motion to dismiss or a motion for summary judgment. Where there are no factual questions, I would agree with Defendants' position that summary judgment may be the appropriate forum to adjudicate the statute of limitations question. In this case, however, there are numerous issues of material fact that affect the inquiry, including the facts surrounding Defendants' alleged efforts to conceal their fraud. While the *Vogel* and *Gruber* decisions are older cases, I do not find them to have been overturned or otherwise affected by more recent law, including the Third Circuit's decision in *NAHC*, with respect to this specific point.[6] In-

---

6. Defendants also contend that *Vogel* is inapposite because it applied an actual notice standard to the plaintiffs' claims. Although the Third Circuit has since clarified that the inquiry notice standard is appropriate, I do not find that *Vogel* was overruled to the extent that it pointed out that factual disputes render summary judgment inappropriate. This point is an accurate statement of the law regardless of whether inquiry or actual notice governs the statute of limitations dispute. Further,

deed, courts outside of this Circuit have also recognized that where factual questions exist, the question of when the statute of limitations begins to run is properly reserved for trial. *Young v. Lepone,* 305 F.3d 1, 9 (1st Cir.2002); *In re Ames Dept. Stores,* 991 F.2d at 970. Accordingly, I will deny Defendants' Motion For Summary Judgment on the grounds that these actions are barred by the one year limitations period.

## IV. CONCLUSION

NOW THEREFORE, IT IS HEREBY ORDERED this 25 day of June 2003, that Defendants' Motions For Summary Judgment (D.I. 528, 530 and 532) on the grounds that the instant actions are barred by the statute of limitations are DENIED.

the *Vogel* court was particularly concerned about the factual issues surrounding defendants' alleged active concealment of the asserted fraud, an issue which is present in this case, as well.